**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| AMERICA'S KIDS, LLC, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff,* | |
| *v.* | |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| *Defendant.* | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff America's Kids, LLC ("Plaintiff" or "America's Kids"), brings this Class Action Complaint and Demand for Jury Trial against Defendant Zurich American Insurance Company ("Defendant" or "Zurich") for wrongfully denying its claims under an all-risk property insurance policy for losses sustained due to the ongoing COVID-19 pandemic. Plaintiff alleges as follows upon personal knowledge as to itself and its own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by its attorneys:

### NATURE OF THE ACTION

1.      Plaintiff America's Kids is a family-owned business enterprise that operates 18 retail establishments, offering a range of children's clothes, shoes, accessories, school uniforms, toys, and furniture. Plaintiff employs hundreds of people across the country, including in Illinois, New York, New Jersey, Pennsylvania, Maryland, and the District of Columbia. Plaintiff has been forced—through no fault of its own—to close its doors to the public as a result of the COVID-19 global pandemic and pursuant to orders of civil authority (the "Closure Orders," defined below), bringing its business to a standstill.

1

2.      To protect its business in situations like these, Plaintiff obtained business interruption insurance from Defendant, as set forth in Zurich's Business Income Coverage Form, No. PPP-0130 (08 16) (the "Business Income Coverage Form") and Extra Expense Coverage Form, No. PPP-0132 (08 16) (the "Extra Expense Coverage Form"). These two forms together provide, *inter alia*, "Business Income" coverage, "Extra Expense" coverage, "Civil Authority" coverage, and "Microorganism" coverage.

3.      However, in blatant breach of the insurance obligations that Defendant voluntarily undertook in exchange for Plaintiff's premium payments, Defendant issued a blanket denial to Plaintiff's claim for Business Income losses or other covered expenses related to COVID-19 or the Closure Orders. Finding itself in troubled times with an onslaught of insurance claims related to COVID-19, Defendant abandoned the industry's established standards of good faith and fair dealing, instead issuing categorical denials without any meaningful coverage investigation, hoping to deter policyholders from pursuing their rights, and forcing Plaintiff to file this lawsuit to enforce its covered benefits under the Policy.

4.      As a result of Defendant's wrongful denial of coverage, Plaintiff brings this action, on behalf of itself and all those similarly situated, for declaratory judgement establishing that the COVID-19 pandemic has caused physical property loss and damage to property and triggers coverage under the Business Income Coverage Form and Extra Expense Coverage Form; for breach of Defendant's contractual obligation under the Business Income Coverage Form and Extra Expense Coverage Form; to indemnify Plaintiff and others similarly situated for Business Income losses and Extra Expenses; and for violations of New York's General Business Law (GBL) § 349 *et seq.*

## PARTIES

5.    Plaintiff America's Kids, LLC, is a limited liability company incorporated and existing under the laws of the State of New York. Plaintiff operates retail establishments located throughout the United States, including in Illinois, New York, New Jersey, Pennsylvania, Maryland, and the District of Columbia.

6.    Defendant Zurich is an insurance carrier organized under the laws of the State of Illinois, with its principal place of business at 1299 Zurich Way, Schaumberg, Illinois 60196. Zurich is part of the Zurich Insurance Group and is licensed to sell insurance in both Illinois and New York.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that section apply.

9.    This Court has personal jurisdiction over Defendant because it is headquartered in Illinois. At all relevant times, Defendant has submitted to jurisdiction in this state by: (a) transacting business in Illinois; (b) contracting to insure persons, properties, or risks located within Illinois at the time of contracting; and (c) making contracts substantially connected with Illinois.

10.    This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201

because an actual controversy exists between the parties as to their respective rights and obligations under the Policy with respect to the loss of Business Income and Extra Expense arising from the events detailed herein.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in Schaumberg, Illinois and within the Northern District of Illinois.

## FACTUAL BACKGROUND

### I.     The Zurich All-Risk Policy.

12.     In exchange for a substantial premium, Defendant issued to Plaintiff Policy No. CPO 9156382-05 for the policy period between April 14, 2019 to April 14, 2020. The policy is attached as Exhibit A (hereinafter, the "Policy").

13.     The Policy is an "all-risk" policy, meaning that it covers all risk of loss unless the risk is expressly and specifically excluded. Specifically, Defendant agreed to pay for all losses covered by a "covered cause of loss," defined as "a fortuitous cause or event, not otherwise excluded, which actually occurs during this policy period."

14.     The Policy was issued to Plaintiff and covers Plaintiff's retail locations described below.

15.     Plaintiff has performed all of its obligations under the Policy, including the payment of premiums.

### A.     Business Income Coverage

16.     One type of coverage provided by the Policy is for loss of business income, often called "business interruption" insurance. This coverage is specifically provided for in a section of the Policy titled "Business Income Coverage Form," Form No. PPP-0130 (08 16).

17.     Pursuant to the Business Income Coverage Form, Defendant agreed to "pay the actual loss of 'business income'" sustained by Plaintiff "due to the necessary 'suspension' of [its] 'operations' during the 'period of restoration.'" (Business Income Coverage Form, § A.)

18.     The "'suspension' must be caused by direct physical loss of or damage to property" at insured premises. (*Id.*) "Suspension" means "the slowdown or cessation of . . . business activities" or "that a part or all of the covered locations is rendered untenantable." (Exhibit A, Commercial Property Definitions, Form PPP-0103 (08 16), § 80.)

19.     "Business income" is defined in relevant part as "net income," i.e., "the net profit or loss…that would have been earned or incurred before taxes," plus "continuing normal operating expenses." (*Id.*, §§ 5, 10, & 48.)

20.     The Business Income Coverage Form also contains additional coverage for an "Extended Period of Indemnity." Pursuant to this additional coverage, Defendant agreed to pay for the actual loss of Plaintiff's business income caused by the business interruption described above, but during an "extended period of indemnity." (Business Income Coverage Form, § B.5.)

21.     The Business Income Coverage Form further provides additional coverage for "Expense to Reduce Loss." Pursuant to this additional coverage, Defendant agreed to pay "reasonable and necessary expenses" incurred by Plaintiff "to reduce the amount of loss of 'business income.'" (*Id.*, § B.4.)

22.     The Business Income Coverage Form contains specific exclusions, but none mention viruses or pandemics. (*See* Business Income Coverage Form, § C.)

**B.      Extra Expense Coverage**

23.     Another type of coverage provided by the Policy is for "extra expense." This coverage is specifically provided for in a section of the Policy titled "Extra Expense Coverage

Form," Form No. PPP-0132 (08 16).

24.     Pursuant to the Extra Expense Coverage Form, Defendant agreed to "pay for the actual and necessary 'extra expense'" incurred by Plaintiff "due to direct physical loss of or damage to property" at the insured premises. (Extra Expense Coverage Form, § A.)

25.     "Extra expense" means "operating expenses [incurred] during the 'period of restoration' that would not have been necessary to incur if there had been no direct physical loss or damage to the property, provided such extra expense are incurred: (a) in an attempt to avoid a 'suspension' of or to continue those 'operations' which have been affected by the direct physical loss or damage to the property; or (b) in an attempt to minimize the 'period of restoration.'" (Exhibit A, Commercial Property Definitions, Form PPP-0103 (08 15), § 24.)

26.     The Extra Expense Coverage Form also contains specific exclusions, but none mention viruses or pandemics. (*See* Extra Expense Coverage Form, § C.)

**C.     Civil Authority Coverage**

27.     The Policy also provides "Civil Authority" coverage under both the Business Income Coverage Form and the Extra Expense Coverage Form. The Civil Authority coverage provisions are provided in both Forms as "additional coverage" and thus provide an independent basis for business income and extra expense coverage. This additional coverage can be triggered even when the standard business income and extra expense coverage are not.

28.     Under the Civil Authority coverage provisions, Defendant promised to "pay for the actual and necessary 'extra expense'" and "the actual loss of 'business income'" sustained by Plaintiff "resulting from the necessary 'suspension'....if the 'suspension' or delay is caused by order of civil authority that prohibits access" to the insured premises. (Business Income Coverage Form, § B.1; Extra Expense Coverage Form, § B.1.) The order "must result from a

civil authority's response to direct physical loss of or damage to property located within one mile" from the insured premises where the lost business income or extra expense was incurred. (*Id.*)

### D.    **Microorganism – Business Income Coverage**

29.    The Policy also provides "Microorganism" coverage under the Business Income Coverage Form. Like the Civil Authority coverage provisions, the Microorganism coverage is listed as an "additional coverage" and thus provides another basis for business income coverage.

30.    Under the Microorganisms coverage provision, Defendant promised to "pay for the actual loss of 'business income'" sustained by Plaintiff due to the "necessary 'suspension' of [Plaintiff's] 'operations' from direct physical loss of or damage to [c]overed [p]roperty caused by 'microorganisms'…" (Business Income Coverage Form, § B.8.)

31.    "Microorganisms" are defined to include "virus." (Exhibit A, Commercial Property Definitions, Form PPP-0103 (08 16), § 44.)

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

32.    The COVID-19 pandemic and the related Closure Orders triggered the Business Income, Extra Expense, Civil Authority, and Microorganism coverages provided by the Policy.

## II.    **The COVID-19 Pandemic.**

33.    For years, if not decades, the Center for Disease Control and Prevention ("CDC") along with the World Health Organization ("WHO") have been warning about the possibility of an airborne virus that could cause a worldwide pandemic.

34.    COVID-19 is a highly contagious airborne virus that has rapidly spread and continues to spread across the United States.

35.    COVID-19 is a physical substance and an organic human pathogen that travels

through respiratory droplets. The virus physically transforms the air exposed to it and attaches itself to surfaces and structures.

36.     The COVID-19 virus spreads primarily by "fomite"—meaning objects, materials, or surfaces that have been physically contaminated or infected by respiratory droplets—and can survive on surfaces for extended periods of time. Recent information on the CDC's website provides that COVID-19 spreads when people are within six feet of each other or when a person comes in contact with a surface or object that has the virus on it.[1]

37.     According to a scientific study in The New England Journal of Medicine, the coronavirus responsible for the COVID-19 disease—SARS-CoV-2—can physically infect and survive on surfaces for up to 72 hours.[2]

38.     Another scientific study documented in the Journal of Hospital Infection found that human coronaviruses, such as COVID-19, can remain infectious on inanimate surfaces at room temperature for up to nine days.[3]

39.     While in some cases asymptomatic, COVID-19 is also known to cause severe and sometimes fatal respiratory failure. This, in addition to the highly contagious nature of COVID-19, renders any property exposed to the contagion unsafe and dangerous.

40.     On March 11, 2020, the WHO declared that the emerging threat of COVID-19

---

[1] *How COVID-19 Spreads*, Ctr. for Disease Control and Prevention (April 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[2] Neeltje van Doremalen, Ph.D., et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, The New England Journal of Medicine (April 16, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973?articleTools=true.

[3] *See* G. Kampf, et al. *Persistence of coronavirus on inanimate surfaces and their inactivation with biocidal agents* (February 06, 2020), available at https://www.journalofhospital infection.com/action/showPdf?pii=S0195-6701%2820%2930046-3.

constituted a global pandemic.[4]

41.     While some rogue media outlets have downplayed the danger and impact of the COVID-19 pandemic, the scientific community and those personally and professionally affected by the virus recognize COVID-19 as a cause of real physical loss and damage. Recently, the Pennsylvania Supreme Court found that the COVID-19 pandemic constitutes a "natural disaster," namely because, like other identified natural disasters, it involves "substantial damage to property, hardship, suffering or possible loss of life." *Friends of DeVito v. Wolf*, No. 68 MM 2020, 2020 WL 1847100, at 10 (Pa. Apr. 13, 2020).

42.     Governmental authorities and public health officials around the country have similarly acknowledged that a pandemic causes direct physical loss and damage to property. For example:

    a.     The State of Colorado issued a public health order indicating that "COVID-19 … **physically contributes to property loss, contamination, and damage**…" (Emphasis added);

    b.     The State of Washington issued a stay-at-home proclamation stating the "COVID-19 pandemic and its progression … remains a public disaster affecting life, health, [and] **property**…" (Emphasis added);

    c.     The State of Indiana issued an executive order recognizing that COVID-19 has the "propensity to **physically impact surfaces and personal property**." (Emphasis added);

    d.     The City of New Orleans issued an order stating "there is reason to believe that COVID-19 may spread amongst the population by various means of exposure, including the propensity to attach to surfaces for prolonged period of time, thereby spreading from surface to person and **causing property loss and damage** in certain circumstances." (Emphasis added);

    e.     The State of New Mexico issued a public health order acknowledging the

---

[4] *See WHO Director-General's opening remarks at the media briefing on COVID-19*, World Health Organization (March 11, 2020), available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

"threat" COVID-19 "poses" to **property**." (Emphasis added);

    f.    North Carolina issued a statewide executive order in response to the COVID-19 pandemic not only "to assure adequate protection for lives," but also to "assure adequate protection of… **property**." (Emphasis added); and

    g.    The City of Los Angeles issued an order in response to COVID-19 "because, among other reasons, the COVID-19 virus can spread easily from person to person and it is **physically causing property loss or damage** due to its tendency to attach to surfaces for prolonged periods of time." (Emphasis added).

43.    As these orders all recognize, during a pandemic, the presence of people— whether confirmed carriers of COVID-19 or not—in places, like Plaintiff's insured premises, where business operations require frequent person-to-person and person-to-surface interactions, renders those places unsafe and unusable.

### III.    The Closure Orders and Other Action by Governmental Authorities.

44.    Civil authorities across the country promptly responded to the presence of COVID-19 in their jurisdictions by entering civil authority orders suspending or severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for individuals, including in cities and states with jurisdiction over Plaintiff's insured premises (the "Closure Orders").

45.    As discussed below, all of the various Closure Orders affecting Plaintiff's insured premises were issued in direct response to both the spread and physical presence of COVID-19 on persons and property throughout the areas immediately surrounding Plaintiff's insured premises as well as the hazards posed exposure to *any* human respiratory droplets. At the time the Closure Orders were issued, civil authorities had confirmed that properties and premises throughout their respective jurisdictions contained COVID-19 particles on surfaces and items of property. At the same time, they acknowledged that the emergency posed by the COVID-19

pandemic stemmed, in part, from the unavailability of reliable and efficient virus testing. In other words, under pandemic conditions, exposure to *any* human respiratory droplets posed a serious hazard to public health, grave enough to invoke the authorities' emergency powers.

46. In issuing the Closure Orders, the civil authorities also recognized that the spread of COVID-19 throughout their respective jurisdictions and the risks posed by hazardous human respiratory droplets could not be sufficiently abated by cleaning and disinfecting frequently used surfaces in public settings; it mandated that access to such surfaces be suspended altogether.

47. Plaintiff suspended business operations at each of its retail locations as a result of the spread of COVID-19 in the areas surrounding its insured premises and/or the Closure Orders described below.

**A. New York**

48. Seven of Plaintiff's insured retail locations are located in the New York City area.

49. New York has been called the "epicenter" of the global COVID-19 outbreak.[5] The State of New York confirmed its first case of COVID-19 on March 1, 2020.[6]

50. On March 7, 2020, Governor Andrew Cuomo declared a state of emergency after 89 cases had been confirmed in the state.[7] On March 12, 2020, Mayor Bill de Blasio of New York City likewise declared a state of emergency in New York City after 95 cases had been

---

[5] Jesse McKinley, *New York City Region is Now an Epicenter of the Coronavirus Pandemic*, N.Y. TIMES, (March 22, 2020), available at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html.

[6] Melanie Grayce West, *First Case of Coronavirus Confirmed in New York State*, WALL ST. J., (March 1, 2020), available at https://www.wsj.com/articles/first-case-of-coronavirus-confirmed-in-new-york-state-11583111692.

[7] N.Y. Executive Order No. 202 (March 7, 2020), available at https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york.

confirmed in the city.[8] All sixty-two counties in the State of New York declared states of emergency by March 16, 2020. In early April, Governor Cuomo likened the virus to "a fire spreading." [9]

     51.     In response to the growing COVID-19 pandemic, Governor Cuomo and Mayor De Blasio issued multiple executive orders including, but are not limited to, the following:

a.     On March 12, by Executive Order 202.1, Governor Cuomo announced restrictions on mass gatherings.[10]

b.     On March 16, 2020, Mayor de Blasio, by New York City Emergency Executive Order No. 100, announced further restrictions on businesses in New York City, specifically stating that "the virus physically is causing property loss and damage."[11]

c.     On March 18, by Executive Order 202.6, Governor Cuomo ordered that all non-essential businesses reduce their on-site workers by 50%, effective at 8:00 p.m. on March 20, 2020.[12]

d.     On March 19, 2020, by Executive Order 202.7, Governor Cuomo ordered that all non-essential businesses reduce their on-site workers by 75%, effective at 8:00

---

[8] De Blasio Declares State of Emergency in N.Y.C., and Large Gatherings are Banned, N.Y. TIMES, (March 12, 2020), available at https://www.nytimes.com/2020/03/12/nyregion/coronavirus-new-york-update.html.

[9] *Coronavirus Hot Spots Emerging Near New York City*, N.Y. TIMES (April 5, 2020), available at https://www.nytimes.com/2020/04/04/nyregion/coronavirus-new-york-update.html#link-696ea085.

[10] N.Y. Executive Order No. 202.1 (March 12, 2020), available at https://www.governor.ny.gov/news/no-2021-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

[11] City of New York, Emergency Executive Order No. 100 (March 16, 2020), available at https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf.

[12] N.Y. Executive Order No. 202.6 (March 18, 2020), available at https://www.governor.ny.gov/news/no-2026-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

p.m. on March 21, 2020.[13]

e.  On March 20, 2020, by Executive Order 202.8, Governor Cuomo ordered that all non-essential businesses statewide close in-office personnel functions through April 19, 2020, effective at 8:00 p.m. on March 22, 2020.[14] That same day, Mayor de Blasio, by New York City Emergency Executive Order No. 102, also ordered the closure of all non-essential business in New York City due to "the propensity of the virus to spread person-to-person and also because the actions taken to prevent such spread have led to property loss and damage."[15]

52.  As of June 16, 2020, there were 388,719 diagnosed cases of COVID-19 and 30,645 deaths reported in the State of New York.[16]

**B.  New Jersey**

53.  Two of Plaintiff's insured retail locations are located in New Jersey.

54.  The State of New Jersey confirmed its first case of COVID-19 on March 4, 2020.

55.  On March 9, 2020, Governor Philip Murphy declared a public health emergency and state of emergency in New Jersey.[17]

56.  On March 16, 2020, by Executive Order 104, Governor Murphy suspended operations of all gyms, movie theatres, bars, and casinos, noting that there were 178 positive

---

[13] N.Y. Executive Order No. 202.7 (March 19, 2020), available at https://www.governor.ny.gov/news/no-2027-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

[14] N.Y. Executive Order No. 202.8 (March 20, 2020), available at https://www.governor.ny.gov/news/no-2028-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency.

[15] City of New York, Emergency Executive Order No. 102 (March 20, 2020, available at https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-102.pdf.

[16] *New York Coronavirus Map and Case Count*, N.Y. TIMES (June 16, 2020), available at https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html.

[17] N.J. Executive Order No. 103 (March 9, 2020), available at https://nj.gov/infobank/eo/056murphy/pdf/EO-103.pdf.

cases of COVID-19 in New Jersey at that time.[18]

57.    On March 21, 2020, by Executive Order No. 107, Governor Murphy ordered all nonessential retail businesses to close their brick-and-mortar premises and directed all residents to stay at home until further notice, noting that there were "at least 890 positive cases of COVID-19 in New Jersey" at that time, "with at least 11 of those cases having resulted in death."[19]

58.    As of June 16, there were 167,103 diagnosed cases of COVID-19 and 12,676 deaths reported in the State of New Jersey.[20]

### C.    Illinois

59.     Four of Plaintiff's insured retail locations are located in Illinois, largely in the greater Chicago area.

60.    The State of Illinois confirmed its first case of COVID-19 on January 24, 2020.

61.    On March 9, 2020, Governor J.B. Pritzker declared all counties in the State of Illinois as a disaster area, specifically "in response to the outbreak of COVID-19." On April 1, Governor Pritzker again declared all counties in the State of Illinois as a disaster area, specifically "in response to the exponential spread of COVID-19."[21]

62.    On March 16, 2020, by Executive Order 2020-07, Governor Pritzker ordered the suspension of on-premises consumption at all food, bar, and restaurant business—noting that

---

[18] N.J. Executive Order No. 104 (March 16, 2020), available at https://nj.gov/infobank/eo/056 murphy/pdf/EO-104.pdf.

[19] N.J. Executive Order No. 107 (March 21, 2020), available at https://nj.gov/infobank/eo/056 murphy/pdf/EO-107.pdf.

[20] *New Jersey Coronavirus Map and Case Count*, N.Y. TIMES (June 16, 2020), available at https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html.

[21] Ill. Executive Order No. 2020-19 (April 1, 2020), available at https://www2.illinois.gov/Pages /Executive-Orders/ExecutiveOrder2020-19.aspx.

"the ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages"—and prohibited gatherings of 50 people or more, including at non-essential venues such as "fitness centers, bowling alleys, private clubs, and theatres.[22]

63.     On March 20, 2020, in response to the rapid spread of COVID-19 in the greater Chicago Area and throughout Illinois, Governor Pritzker issued Executive Order 2020-10, which (1) directed Illinois residents to stay in their homes except when performing "essential" activities, (2) prohibited gatherings of 10 or more people, and (3) required "non-essential" businesses to cease operations.[23]

64.     On April 1, 2020, Governor Pritzker extended that Closure Order until April 30, 2020, stating that "in a short period of time, COVID-19 has rapidly spread throughout Illinois."[24]

65.     As of June 16, 2020, there were 134,255 diagnosed cases of COVID-19 and 6,544 deaths reported in the State of Illinois.[25]

**D.     Pennsylvania**

66.     Three of Plaintiff's insured retail locations are located in Philadelphia, Pennsylvania.

---

[22] Ill. Exec. Order No. 2020-07 (March 16, 2020), available at https://www2.illinois.gov/Pages /Executive-Orders/ExecutiveOrder2020-07.aspx.

[23] Ill. Executive Order No. 2020-10 (March 20, 2020), available at https://www2.illinois.gov /Pages/Executive-Orders/ExecutiveOrder2020-10.aspx.

[24] Ill. Executive Order No. 2020-19 (April 1, 2020), available at https://www2.illinois.gov/Pages /Executive-Orders/ExecutiveOrder2020-19.aspx.

[25] *Illinois Coronavirus Map and Case Count*, N.Y. TIMES (June 16, 2020), available at https://www.nytimes.com/interactive/2020/us/illinois-coronavirus-cases.html.

67.     On March 6, 2020, Governor Tom Wolf reported the first two confirmed cases of COVID-19 and issued a proclaimed the existence of a disaster emergency throughout the Commonwealth of Pennsylvania.

68.     On March 16, 2020, Mayor of Philadelphia Jim Kenney ordered the closure of all non-essential businesses "in response to the latest data…on COVID-19."[26] Mayor Kenney later noted that "COVID-19 may remain viable for hours to days on surfaces made from a variety of materials located in businesses and other places, thus contaminating certain property and places."[27]

69.     On March 16, 2020, Governor Wolf urged all "nonessential" businesses to close their physical locations and all restaurants and bars to close their dine-in facilities to "help stop the spread of COVID-19."[28]

70.     On March 19, 2020, Governor Wolf ordered all "non-life sustaining" businesses in the Commonwealth to cease operations and close all physical locations.[29]

71.     On March 23, 2020, Governor Wolf ordered residents of Philadelphia County and

---

[26] Press Release, City of Philadelphia, City Announces New Restrictions on Business Activity in Philadelphia (March 16, 2020), available at https://www.phila.gov/2020-03-16-city-announces-new-restrictions-on-business-activity-in-philadelphia/.

[27] City of Philadelphia, Emergency Executive Order No. 02 (March 22, 2020), available at https://www.phila.gov/media/20200322130746/Order-2-Business-And-Congregation-Prohibition-Stay-At-Home.pdf.

[28] Press Release, Office of Governor Tom Wolf, Wolf Administration Updates Businesses on Guidance for COVID-19 Mitigation Efforts (March 16, 2020), available at https://www.governor.pa.gov/newsroom/wolf-administration-updates-businesses-on-guidance-for-covid-19-mitigation-efforts/.

[29] Pa. Executive Order (March 19, 2020) available at https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order.

various other counties in the Commonwealth to stay at home. That same day, the Pennsylvania Department of Health issued a similar order, noting that "operation of non-life-sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID-19."[30]

72.     As of June 16, 2020, there were 83,872 diagnosed cases of COVID-19 and 6,311 deaths reported in the Commonwealth of Pennsylvania.[31]

**E.     Washington D.C. and Maryland**

73.     Two of Plaintiff's insured retail locations are located in the Washington D.C. metropolitan area or otherwise throughout Maryland.

74.     The District of Columbia confirmed it first case of COVID-19 on March 7, 2020.

75.     The State of Maryland reported its first three cases of COVID-19 on March 5, 2020.

76.     On March 5, 2020, Governor Larry Hogan of Maryland declared a state of emergency and existence of a catastrophic health emergency in Maryland.[32] On March 16, 2020, Governor Hogan ordered the closure of all restaurants and bars (except for delivery or takeout services), fitness centers, and theatres.[33] On March 23, 2020, Governor Hogan ordered the

---

[30] Pa. Dep't of Health, Order of the Secretary of the Pennsylvania Department of Health to Stay at Home (March 23, 2020), available at https://www.governor.pa.gov/wp-content/uploads/ 2020/03/03.23.20-SOH-Stay-at-Home-Order.pdf.

[31] *Pennsylvania Coronavirus Map and Case Count*, N.Y. TIMES (June 16, 2020), available at https://www.nytimes.com/interactive/2020/us/pennsylvania-coronavirus-cases.html.

[32] Md. Proclamation (March 5, 2020), available at https://governor.maryland.gov/wp-content/uploads/2020/03/Proclamation-COVID-19.pdf.

[33] Md. Executive Order (March 16, 2020), available at https://governor.maryland.gov/wp-content/uploads/2020/03/Executive-Order-Amending-Large-Gatherings.pdf.

closure of non-essential businesses, generally.[34]

77.    On March 11, 2020, Mayor Muriel Bowser of the District of Columbia declared a state of emergency and health emergency due to the "imminent hazard of or actual occurrence of widespread exposure to an infectious agent (COVID-19) that poses a significant risk of substantial future harm to a large number of people in the District of Columbia."[35] On March 16, 2020, Mayor Bowser ordered that restaurants cease table service, and on March 24, 2020, Mayor Bowser ordered the physical closure of all non-essential businesses.[36]

78.    As of June 16, 2020, there were 62,932 diagnosed cases of COVID-19 and 2,982 deaths reported in the State of Maryland.[37]

79.    As of June 16, 2020, there were 9,818 diagnosed cases of COVID-19 and 520 deaths reported in the District of Columbia.[38]

---

[34] Md. Executive Order (March 23, 2020), available at https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-THIRD-AMENDED-3.23.20.pdf.

[35] District of Columbia, Mayor's Order No. 2020-045 (March 11, 2020), available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicEmergency03.11.20.pdf; District of Colombia, Mayor's Order No. 2020-046 (March 11, 2020), available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/MO.DeclarationofPublicHealthEmergency03.11.20.pdf.

[36] District of Columbia, Mayor's Order No. 2020-048 (March 16, 2020), available at https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/publication/attachments/MO-Prohibition-on-Mass-Gatherings-During-Public-Health-Emergency.pdf; District of Colombia, Mayor's Order No. 2020-053 (March 24, 2020) available at https://www.pecklaw.com/wp-content/uploads/2020/03/DC-Mayors-Order-2020-053-1.pdf.

[37] *Maryland Coronavirus Map and Case Count*, N.Y. TIMES (June 16, 2020), available at https://www.nytimes.com/interactive/2020/us/maryland-coronavirus-cases.html.

[38] *District of Columbia Coronavirus Map and Case Count*, N.Y. TIMES (June 16, 2020), available at https://www.nytimes.com/interactive/2020/us/washington-dc-coronavirus-cases.html.

**IV.    Plaintiff's Losses Due to the COVID-19 Pandemic and Resulting Closure Orders.**

80.    All of Plaintiff's insured retail locations are considered "non-essential businesses" pursuant to the Closure Orders.

81.    As a result of the COVID-19 pandemic and the Closure Orders, America's Kids was required to close its storefronts and suspend its in-person workforce, thereby requiring it to cease its business operations completely across all locations.

82.    Human interaction is critical—and indeed, unavoidable—for Plaintiff's business. However, the hazardous presence of human respiratory droplets on or around Plaintiff's premises (and the risk of a continued hazard should business continue as usual) has damaged the property and has rendered the premises unsafe, uninhabitable, and unfit for this use (*i.e.*, for in-person shopping).

83.    During or around March 5-9, 2020, Plaintiff became aware that its insured premises had been damaged by hazardous human respiratory droplets which posed an immediate danger to any person(s) physically present on the premises.

84.    After that point, it became impracticable to operate Plaintiff's business without immediately exposing the insured premises to hazardous human respiratory droplets. Any attempt to operate the business would immediately and necessarily result in the property's exposure to the respiratory droplets of its staff and customers, making the property unfit for occupation.

85.    However, in an effort to mitigate its losses, Plaintiff continued to operate its business while taking precautions to minimize the premises exposure to hazardous human respiratory droplets.

86.    Ultimately, the Closure Orders prohibited the public from accessing Plaintiff's

insured premises, thereby causing the total suspension of their operations.

87.     Upon information and belief, since March 5-9, 2020, people carrying COVID-19 particles in, on, or about their person, have been physically present at or around Plaintiff's insured premises during the time the Policy was in effect.

88.     Upon information and belief, human respiratory droplets and/or COVID-19 virus particles have been physically present at or around Plaintiff's insured premises—both airborne and on surfaces and items of property at or around Plaintiff's premises—during the time the Policy was in effect.

89.     Plaintiff has sustained direct physical loss and damage to items of property located at its premises and direct physical loss and damage to its premises described in the Policy as a result of the presence of COVID-19 particles, hazardous human respiratory droplets, and/or the COVID-19 pandemic. The COVID-19 pandemic and the presence of hazardous respiratory droplets caused direct physical loss of and/or damage to the premises insured under the Policy by, among other things, damaging the property, denying access to the property, preventing customers from physically occupying the property, causing the property to be physically uninhabitable by customers, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

90.     Plaintiff has incurred substantial Business Income losses and Extra Expense caused by: (i) the COVID-19 pandemic and the presence of hazardous respiratory droplets at or around Plaintiff's insured premises, and (ii) the Closure Orders which prohibit access to Plaintiff's insured premises or the sale of Plaintiff's products and services.

**V.     Zurich's Denial of Plaintiff's Claim for Coverage.**

91.     On March 27, 2020, Plaintiff submitted a timely insurance claim to Zurich

requesting coverage for its business interruption losses and extra expenses promised under the Policy.

92.    On April 27, 2020, Zurich denied Plaintiff's claim in writing. (*See* April 15, 2020 Denial Letter, attached hereto as Exhibit B.)

93.    After receiving Defendant's denial letter, on June 1, 2020, Plaintiff contacted Zurich to clarify its position that the COVID-19 pandemic caused direct physical loss of or damage to property at its insured premises. Plaintiff's letter is attached as Exhibit C.  Zurich refused to change its coverage position.

94.    Upon information and belief, Zurich has uniformly refused to provide Business Income, Extra Expense, Civil Authority, and Microorganism coverage to most, if not all, insured businesses that have claimed business interruption losses and/or extra expense as a result of COVID-19 and the Closure Orders, as described below.

95.    In the wake of the COVID-19 pandemic, Zurich published a memo to its website, stating:

> Where our policies cover losses from the coronavirus outbreak, we are settling them swiftly. Unfortunately, the vast majority of business interruption policies across the industry are intended to cover physical damage at a property and do not include protection for a global pandemic, or measures required to contain the disease. We are reviewing every case individually and are committed to paying all valid claims quickly.[39]

96.    However, Zurich categorically issued denials without first conducting a meaningful coverage investigation. Zurich considered only its own interests and did not meaningfully consider and address the coverage options available to policyholders but proceeded only according to its one-sided and self-serving interpretation of the Policy.

---

[39] *Covid-19 - Business Interruption*, Zurich, available at https://www.zurich.co.uk/business/coronavirus/business-interruption.

97.     Pushing its denial agenda, Zurich's denial letters asserted coverage positions which Defendant reasonably knew were without merit. For example, in rejecting Plaintiff's claim for Business Income coverage, Zurich stated that "any damage to property would be excluded under the Microorganisms Exclusions, found in Section 12 of Form PPP-0110 (page 3 of 7)." However, the "Microorganisms Exclusions" cited by Zurich are "excluded causes of loss" in the "Real and Personal Property Coverage Form," an entirely separate coverage form that provides a separate and distinct type of property coverage from the Business Income, Extra Expense, Civil Authority, or Microorganism coverages claimed by Plaintiff. The Business Income Coverage Form contains no such exclusion.

98.     Zurich ignored its duty to interpret any exclusions narrowly, took advantage of the power and information asymmetries between insurers and their insured, construed the policy language beyond reason and in favor of denial, and misrepresented in its denial letter the effect of the "Microorganisms Exclusions" on the Business Income Coverage Form.

99.     Zurich also failed to acknowledge or address that Microorganism coverage is explicitly included in the "additional coverages" available under the Business Income Coverage Form. Upon information and belief, Zurich uniformly cited the "Microorganisms Exclusions" contained in the Real and Personal Property Coverage Form as a basis for denial and failed to reasonably investigate the Business Income, Extra Expense, Civil Authority, and Microorganism coverages available to policyholders claiming losses related to COVID-19.

100.     Zurich's denial of Plaintiff's independent claim for Civil Authority coverage underscores the shortcomings in its investigation of Plaintiff's claim more generally by making no mention whatsoever of any of Plaintiff's specific locations or the facts affecting the suspension of operations at any of those locations. In fact, Zurich did not mention a single civil

authority order. Instead, Zurich recited the same vague, general conclusion that "the presence of the COVID-19 virus does not constitute 'direct physical loss or damage' to property." *See* Exhibit B. Upon information and belief, Zurich uniformly stated this conclusion to Plaintiff and other policyholders without undertaking any investigation into claims that COVID-19 and/or the resulting Closure Orders caused physical loss of and damage to the insured premises.

101.    Upon information and belief, Zurich also systematically mischaracterized Plaintiff's and other policyholders' claims to Zurich's benefit. For example, in denying Plaintiff's claim, Defendant noted that "there were no known cases of COVID-19 virus at the location as well as no known physical damage to the location." Defendant made no effort to consider any facts or law that would support coverage or to give those facts or law an objective and fair evaluation. Instead, to the extent Zurich conducted *any* investigation into Plaintiff's and other policyholders' claims related to COVID-19, it was merely a pre-text for eliciting statements from policyholders that would hurt their coverage positions and favor Zurich's denial. Zurich used the imprimatur of an investigation to conceal from policyholders that it had no intention of helping them find coverage.

102.    Upon information and belief, Zurich also instructed insurance brokers to discourage policyholders from filing claims and promulgated the false conclusion that no coverage was available under the Business Income Coverage Form.

103.    Upon information and belief, Zurich made these statements in furtherance of a corporate strategy designed to intentionally mislead policyholders about the relevant coverage terms in their policies and the force and effect of certain coverage provisions and to discourage policyholders from filing claims for losses arising from COVID-19-related business interruptions.

104.    This conduct makes it clear that Zurich was not making coverage determinations based on the facts of the claim and the language of the policies that it issued, but rather based on the financial impact that the pandemic would have upon the insurance industry if Zurich covered the losses as required by the language of its own policies. Simply put, Zurich put its own financial interests ahead of the interests of its policyholders (and taxpayers), in violation of both New York and Illinois law.

105.    Finally, unlike many commercial property policies available on the market, the "all-risk" Policy that Zurich sold to Plaintiff does not exclude loss caused by a virus. In fact, Zurich went so far as to create a "Microorganism Exclusion" for its Special and Real Property Coverage Form but did not apply that exclusion to its Business Income Coverage Form, instead providing "Microorganism" as an "Additional Coverage." Thus, Plaintiff reasonably expected that the insurance it purchased from Zurich included coverage for business interruption damage/loss caused by viruses like COVID-19.

106.    Zurich also could have excluded pandemic-related losses under the Business Income Coverage Form or another endorsement to the Policy, as other insurers regularly do. The Insurance Services Office, Inc. ("ISO") frequently drafts form endorsements to clarify policy coverage in anticipated disputes, which insurers regularly incorporate into their policies. In 2006, the ISO drafted a new endorsement, CP 01 40 07 06, acknowledging that claims for business interruption losses would be filed under existing policy language for losses resulting from the presence of disease-causing agents. Endorsement CP 01 40 07 06, which other insurers have since incorporated in policies, provides that the insurer "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Zurich did not include any language to this effect

in the Business Income Coverage Form, nor did it include this endorsement in the Policy.

107.    Instead, Zurich waited until after it collected Plaintiff's premium, and after a pandemic and the resulting Closure Orders caused catastrophic business losses to Plaintiff, to attempt to limit its exposure on the back-end through its erroneous assertion that the presence of COVID-19 is not a physical "loss" or damage and is therefore not a covered cause of loss under its Policy.

108.    That the insurance industry has created and often uses specific exclusions for pandemic-related losses under similar commercial property policies undermines Zurich's claim that the presence of a virus, like COVID-19, did not cause physical "loss" or damage to Plaintiff's premises. Indeed, if a virus could not result in physical "loss" or damage to property, such specific exclusions for pandemic or virus-related losses would be unnecessary.

109.    Thus, Zurich's swift and wholesale denial of coverage is arbitrary, unreasonable, and inconsistent with the facts and plain language of the Policy. Upon information and belief, Zurich's denials were driven by Zurich's desire to reduce or extinguish its own financial exposure to the economic fallout caused by the COVID-19 crisis, rather than its obligation to initiate, as is its legal duty, a full and fair investigation of the claims and a careful review of the Policy it sold to Plaintiff.

## CLASS ALLEGATIONS

110.    **Class Definition:** Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), Plaintiff brings this action on behalf of itself and a class of similarly situated individuals defined as follows:

> **Class**
> All persons and entities that own an interest in a New York business that: (1) has Business Income, Extra Expense, Civil Authority, and/or Microorganism coverage to insure property under Zurich's Business Income Coverage Form, No. PPP-0130 (08 16)

and/or Extra Expense Coverage Form, No. PPP-0132 (08 16) or any other Zurich coverage form with identical language; (2) suffered Business Income and/or Extra Expense losses due to the COVID-19 pandemic, (3) has made an insurance claim for losses; and (4) has been denied coverage.

**New York Subclass**
All persons and entities that own an interest in a New York business that: (1) has Business Income, Extra Expense, Civil Authority, and/or Microorganism coverage to insure property in New York under Zurich's Business Income Coverage Form, No. PPP-0130 (08 16) and/or Extra Expense Coverage Form, No. PPP-0132 (08 16) or any other Zurich coverage form with identical language; (2) suffered Business Income and/or Extra Expense losses due to the COVID-19 pandemic, (3) has made an insurance claim for losses; and (4) has been denied coverage.

**New Jersey Subclass**
All persons and entities that own an interest in a New York business that: (1) has Business Income, Extra Expense, Civil Authority, and/or Microorganism coverage to insure property in New Jersey under Zurich's Business Income Coverage Form, No. PPP-0130 (08 16) and/or Extra Expense Coverage Form, No. PPP-0132 (08 16) or any other Zurich coverage form with identical language; (2) suffered Business Income and/or Extra Expense losses due to the COVID-19 pandemic, (3) has made an insurance claim for losses; and (4) has been denied coverage.

**Illinois Subclass**
All persons and entities that own an interest in a New York business that: (1) has Business Income, Extra Expense, Civil Authority, and/or Microorganism coverage to insure property in Illinois under Zurich's Business Income Coverage Form, No. PPP-0130 (08 16) and/or Extra Expense Coverage Form, No. PPP-0132 (08 16) or any other Zurich coverage form with identical language; (2) suffered Business Income and/or Extra Expense losses due to the COVID-19 pandemic, (3) has made an insurance claim for losses; and (4) has been denied coverage.

**Pennsylvania Subclass**
All persons and entities that own an interest in a New York business that: (1) has Business Income, Extra Expense, Civil Authority, and/or Microorganism coverage to insure property in Pennsylvania under Zurich's Business Income Coverage Form, No. PPP-0130 (08 16) and/or Extra Expense Coverage Form, No. PPP-0132 (08 16) or any other Zurich coverage form with identical language; (2) suffered Business Income and/or Extra Expense losses due to the COVID-19 pandemic, (3) has made an insurance claim for losses; and (4) has been denied coverage.

**Maryland Subclass**

All persons and entities that own an interest in a New York business that: (1) has Business Income, Extra Expense, Civil Authority, and/or Microorganism coverage to insure property in Maryland under Zurich's Business Income Coverage Form, No. PPP-0130 (08 16) and/or Extra Expense Coverage Form, No. PPP-0132 (08 16) or any other Zurich coverage form with identical language; (2) suffered Business Income and/or Extra Expense losses due to the COVID-19 pandemic, (3) has made an insurance claim for losses; and (4) has been denied coverage.

**DC Subclass**

All persons and entities that own an interest in a New York business that: (1) has Business Income, Extra Expense, Civil Authority, and/or Microorganism coverage to insure property in District of Columbia under Zurich's Business Income Coverage Form, No. PPP-0130 (08 16) and/or Extra Expense Coverage Form, No. PPP-0132 (08 16) or any other Zurich coverage form with identical language; (2) suffered Business Income and/or Extra Expense losses due to the COVID-19 pandemic, (3) has made an insurance claim for losses; and (4) has been denied coverage.

(Together, the "Classes." Members of the proposed Classes are jointly referred to herein as "Class Members.")

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

111. **Numerosity:** The exact number of Class members is unknown, but individual joinder in this case is impracticable. The Classes likely consist of thousands if not hundreds of thousands of members. Class members can be easily identified through Defendant's records.

112. **Commonality and Predominance:** There are many questions of law and fact

common to the claims of Plaintiff and the other Class members, and those questions predominate over any questions that may affect individual Class members. Common questions for the Classes include but are not limited to the following:

a. Whether Zurich issued all-risk insurance policies to Plaintiff and Class members in exchange for payment of premiums by Plaintiff and the Class members;

b. Whether Plaintiff and the Classes suffered a covered loss based on the common policies issued to Plaintiff and the Class members;

c. Whether Zurich wrongfully denied all claims based on COVID-19;

d. Whether COVID-19 causes "direct physical loss or damage" to property;

e. Whether Zurich's Business Income coverage applies to a suspension of business caused by COVID-19;

f. Whether the Closure Orders constitute "action[s] of civil authority;"

g. Whether Zurich's Civil Authority coverage applies to a loss of Business Income caused by the Closure Orders requiring the suspension of business as a result of COVID-19;

h. Whether Zurich's Extra Expense coverage applies to efforts to minimize a loss caused by COVID-19;

i. Whether Zurich has breached its contracts of insurance through a blanket denial of all claims based on business interruption, income loss or closures related to COVID-19 and the Closure Orders; and

j. Whether Plaintiff and the Classes are entitled to an award of reasonable attorney fees, interest and costs.

113. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the

Classes in that Plaintiff and Class members purchased identical insurance coverage from Defendant containing identical language regarding Business Income losses and Extra Expense, their coverage claims for COVID-19 losses were denied by Defendant, and they have sustained damages arising out of Defendant's wrongful denials.

114.     **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Classes, and they have the resources to do so. Neither Plaintiff nor its counsel have any interest adverse to those of the other Class members.

115.     **Inconsistent or Varying Adjudications and the Risk of Impediments to Other Class Members' Interests:** Plaintiff seek class-wide adjudication as to the interpretation, and resultant scope, of the Special Property Coverage Form. The prosecution of separate actions by individual Class members would create an immediate risk of inconsistent or varying adjudications on this issue, which would establish incompatible standards of conduct for Defendant in evaluating future claims. Moreover, the adjudications sought by Plaintiff could, as a practical matter, substantially impair or impede the ability of other Class members, who are not parties to this action, to protect their interests.

116.     **Declaratory and Injunctive Relief:** Defendant acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Classes.

117.    **Superiority:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all Class members is impracticable. The prosecution of separate actions by individual Class members would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Classes. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

118.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and discovery.

**FIRST CAUSE OF ACTION**
**Declaratory Relief**
**(On behalf of Plaintiff and the Classes)**

119.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

120.    Plaintiff's Policy, as well as those of other Class members, are insurance contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the Class's losses for claims covered by the Policy.

121.    Plaintiff and other Class members have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them.

122.    Defendant has arbitrarily and without justification refused to reimburse Plaintiff and Class members for any losses incurred by them in connection with the covered business losses and extra expenses related to the Closure Orders and the necessary interruption of their

businesses stemming from COVID-19.

123.     Zurich has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, such that the Court can render declaratory judgment.

124.     An actual case or controversy exists regarding Plaintiff's and the Classes' rights and Defendant's obligations under the Policy to reimburse Plaintiff and the Classes for the full amount of losses incurred by Plaintiff and the Classes in connection with the Closure Orders and the suspension of their businesses stemming from COVID-19.

125.     Pursuant to 28 U.S.C. § 2201, Plaintiff and the Classes seek a declaratory judgement from this Court declaring the following:

   a.  Plaintiff's and the Classes' losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Business Income Coverage Form and Extra Expense Coverage Form;

   b.  Zurich has waived any right it may have had to assert defenses to coverage, or otherwise seek to bar or limit coverage for Plaintiff's and the Classes' losses, by issuing blanket coverage denials without conducting a claim investigation as required by law; and

   c.  Zurich is obligated to pay Plaintiff and the Classes for the full amount of the losses incurred and to be incurred, in connection with the covered business losses related to the Closure Orders, during the period of restoration and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(On behalf of Plaintiff and the Classes)**

126.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

127.    Plaintiff's Policy, as well as those of other Class members are insurance contracts under which Defendant was paid premiums in exchange for its promise to pay Plaintiff's and the Classes' losses for claims covered by the Policy.

128.    Plaintiff and the Classes have complied with all applicable provisions of the Policy and/or those provisions have been waived by Zurich, or Zurich is estopped from asserting them, yet Defendant has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

129.    By denying coverage for any business losses and extra expense incurred by Plaintiff and the Classes in connection with the Closure Orders and the COVID-19 pandemic, Zurich has breached its coverage obligations under the Policy.

130.    Zurich knowingly and willfully breached its coverage obligations under the Policy in order to protect Defendant's financial interests in the wake of unanticipated insurance claims related to the COVID-19 pandemic.

131.    As a result of Defendant's breaches of the policies, Plaintiff and the Classes have sustained, and continue to sustain, substantial damages for which Defendant is liable, in an amount to be established at trial.

**THIRD CAUSE OF ACTION**
**Statutory Penalty for Deceptive Practices and/or Bad Faith Denial of Insurance**
**(On behalf of Plaintiff and the Classes)**

132.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

133.    New York's General Business Law (GBL) § 349(a) makes it unlawful to engage

in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in" the State of New York.

134.    Defendant operates its business providing insurance services throughout the State of New York, including to Plaintiff and Class members, and it furnishes its' policyholders with standard policy forms to be purchased at large, therefore engaging in consumer-oriented conduct within the meaning of GBL § 349. Upon information and belief, Defendant also issued wholesale coverage denials (using form denial letters) to policyholders claiming business interruption losses related to COVID-19.

135.    When Plaintiff and the Classes purchased the Policy from Defendant, they reasonably believed that claims for such losses would be assessed in a reasonable and fair manner, including a fair coverage investigation.

136.    However, Defendant, finding itself in troubled economic times, disregarded the ordinary and intended purpose of the Policy's Business Income, Civil Authority, Microorganism, and Extra Expense coverage, abandoned the industry's (and its own) standards for fair and comprehensive claims investigation and handling, and immediately and categorically denied claims for losses related to the COVID-19 pandemic, including claims by Plaintiff and, upon information and belief, the Classes.

137.    Defendant's immediate coverage denial to Plaintiff's claim was part of a corporate strategy to deny any claims for losses related to COVID-19, without reference to the facts underlying the claim, the ordinary purpose of the relevant policy provisions, or the specific policy language at issue, and was aimed at all policyholders in the general public.

138.    Defendant's conduct in denying Plaintiff's—and, upon information and belief, the Classes'—claims also constitutes "unfair claims settlement practices" under New York Insurance

Law § 2601, which likewise constitutes a deceptive practice under GBL § 349.

139.    Specifically, Defendant categorically and systematically denied claims related to COVID-19 without investigating or referring to the particular facts or the specific policy language (and in Plaintiff's case, without even referencing the relevant policy provisions) and disseminated information to insurance agents, brokers, and the general public designed to mislead policyholders about their coverage rights and to discourage policyholders from even filing claims, in violation of New York Insurance Law that prohibits "knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue" and "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under its policies" and requires insurers to "attempt in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear[.]" *See* § 2601(a)(1), (3), (4).

140.    The practices described above were committed by Defendant knowingly and willfully in order to mislead the public, discourage the filing of claims, and avoid paying benefits to policyholders, that is, to protect Defendant's financial interests (at the expense of the insureds) in the wake of a global pandemic.

141.    Defendant's denials also constitute "improper claims practices" under Illinois law that prohibits insurers from knowingly misrepresenting to their insureds relevant facts or policy provisions contained in policies they issued. *See* 215 ILCS 5/154.6 (h), (n). Defendant's denials were also vexatious and unreasonable.

142.    As a consequence of Defendant's actions, Plaintiff and Class members suffered an ascertainable loss of the coverage benefits that they reasonably believed they were entitled to under the Policy. Plaintiff and Class members also suffered damages by paying premiums to

Defendant for policy coverage and claims processing standards that they did not receive. Plaintiff thus requests that the Court enter a judgment in favor of Plaintiff and the Classes and against Defendant for the premiums they paid to Defendant and/or the coverage benefits that they reasonably believed they were entitled to but did not receive, in an amount to be established at trial.

143.    Alternatively, Plaintiff requests that the Court enter a judgment pursuant to 215 ILCS 5/155 in favor of Plaintiff and the Classes and against Defendant for an amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiff and the Classes are entitled to recover under the policies, exclusive of costs; or (2) $60,000 per class member.

144.    Plaintiff further requests that the Court enter a judgment in favor of Plaintiff and against Defendant for an amount equal to the attorneys' fees and costs incurred by Plaintiff for the prosecution of this coverage action.

**FOURTH CAUSE OF ACTION**
**Bad Faith**
**<u>(On behalf of Plaintiff and the Classes)</u>**

145.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

146.    Defendant owed Plaintiff and the Classes a duty of good faith and fair dealing in conducting its investigation, making a coverage determination, communicating with the insured(s), and in handling the claims described herein. This duty was implicit in the Policy and also derived from the parties' special relationship as insured and insurer.

147.    Defendant breached its duty of good faith and fair dealing by wrongfully, and without reasonable justification, denying coverage to Plaintiff and the Classes under the Policy. Defendant's processing and denial of Plaintiff's claim was unreasonable and done in bad faith. It was reasonably foreseeable (or should have been foreseeable) that Plaintiff and the Classes

would be deprived of coverage benefits and forced to file suit to enforce their rights under the Policy as a result of Defendant's conduct.

148.    Specifically, Defendant intentionally, fraudulently, maliciously, and/or recklessly (1) failed to effectuate a prompt and fair settlement of Plaintiff's claim when liability was reasonably clear; (2) refused and failed to conduct a reasonable, prompt, and fair investigation into the issues surrounding Plaintiff's claim; (3) denied Plaintiff's claim for its own financial preservation and with no reasonable or justifiable basis; (4) failed to treat Plaintiff's interests with equal regard to its own; (5) mischaracterized the nature of Plaintiff's losses in order minimize the coverage available to Plaintiff and to protect Defendant's own financial interests; (6) falsely represented to Plaintiff that coverage was not available under the Policy and ignored provisions of the Policy that plainly provided coverage for Plaintiff's claimed losses; (7) misrepresented relevant facts and policy provisions to Plaintiff; and (8) forced Plaintiff to file suit to enforce its rights under the Policy.

149.    Defendant, acting with conscious disregard for Plaintiff's rights and with the intention of causing (or willfully disregarded the probability of causing) unjust and cruel hardship on Plaintiff, ignored the facts and law validating Plaintiff's claim for benefits, denied Plaintiff's claim, and withheld monies and benefits rightfully due to Plaintiff.

150.    Upon information and belief, Defendant's handling of Plaintiff's claim was part of a general policy and practice of denying all claims for business income and extra expense related to COVID-19.

151.    As a result, Plaintiff and the Classes have sustained, and continue to sustain, substantial consequential damages for which Defendant is liable, in an amount to be established at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other Class members, respectfully request that the Court:

1.      Enter an order certifying the proposed Classes, as defined above, designating Plaintiff as representative of the Classes, and appointing Plaintiff's undersigned attorneys as Class Counsel;

2.      Enter a declaratory judgement in favor of Plaintiff and the Classes and against Defendant, declaring as follows:

      a.    Plaintiff's and the Class members' losses incurred in connection with the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy;

      b.    Zurich has waived any right it may have had to assert defenses to coverage or otherwise seek to bar or limit coverage for Plaintiff's and the Class members' losses by issuing blanket coverage denials without conducting a claim investigation as required under New York law; and

      c.    Zurich is obligated to pay Plaintiff and the Classes for the full amount of the losses incurred and to be incurred in connection with the covered business losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

3.      Enter a judgement on the Second Cause of Action in favor of Plaintiff and the Classes and against Defendant and award damages for breach of contract in an amount to be established at trial;

4.      Enter a judgement on the Third Cause of Action in favor of Plaintiff and the

Classes and against Defendant for deceptive acts and practices in violation of New York's

General Business Law § 349 and granting actual damages and treble damages should the Court

find that Defendant's actions were willful.

5.      Enter a judgment on the Fourth Cause of Action in favor of Plaintiff and the

Classes and against Defendant for bad faith;

6.      Award to Plaintiff reasonable litigation expenses and attorneys' fees;

7.      Award to Plaintiff punitive damages for Defendant's bad faith;

8.      Award to Plaintiff and the Classes pre- and post- judgment interest, to the extent

allowable; and

9.      Award to Plaintiff such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues so triable.

Respectfully submitted,

**AMERICA'S KIDS, LLC, individually and
on behalf of all others similarly situated,**

Dated: June 16, 2020

By: /s/ Benjamin H. Richman
*One of Plaintiff's Attorneys*

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
Theo Benjamin
tbenjamin@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Lily Hough
lhough@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435