## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| AMERICA'S KIDS, LLC, individually and on behalf of all others similarly situated, | Case No. 1:20-cv-03520 |
| *Plaintiff,* | Judge: Hon. Virginia M. Kendall |
| *v.* | |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| *Defendant.* | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

    I.    The pandemic. ..................................................................................................2

    II.    Plaintiff's insurance contract. ......................................................................3

ARGUMENT ......................................................................................................................7

    I.    America's Kids has alleged "physical loss of or damage to" covered property. ..................................................................................................................8

        A.  The language of the Policy makes clear that America's Kids has suffered a "physical loss of or damage to" its property. ....................9

        B.  Zurich's arguments to the contrary fail. ...........................................14

    II.    The microorganisms exclusion does not preclude coverage. .................16

    III.    The Closure Orders were the result of a response to property damage. ..........................................................................................................22

    IV.    Plaintiff has stated a claim for Dependent Premises coverage. .............25

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**United States Circuit Court of Appeals Cases:**

*Brown v. Budz*,
   398 F.3d 904 (7th Cir. 2005) .........................................................................24

*Essex Ins. Co. v. BloomSouth Flooring Corp.*,
   562 F.3d 399 (1st Cir. 2009)...........................................................................12

*Haber v. St. Paul Guardian Ins. Co.*,
   137 F.3d 691 (2d. Cir. 1998)...........................................................................21

*Harper v. Hochstim*,
   278 F. 102 (2d Cir. 1921)................................................................................20

*In re Popkin & Stern*,
   340 F.3d 709 (8th Cir. 2003) ..........................................................................19

*Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*,
   472 F.3d 33 (2d Cir. 2006)...........................................................................8, 13

*Universal Image Productions, Inc. v. Federal Insurance Co.*,
   475 F. App'x 569 (6th Cir. 2012) ...................................................................15

*Willingham v. Life & Cas. Ins. Co.*,
   216 F.2d 226 (5th Cir. 1954) ..........................................................................22

*Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*,
   856 F.3d 1343 (11th Cir. 2017) ......................................................................18

**United States District Court Cases:**

*10E, LLC v. Travelers Indem. Co of Conn.*,
   No. 2:20-cv-04418-SVW-AS, 2020 WL 5359653 (C.D. Cal. Sept. 2, 2020) ..................24

*Bd. of Educ., Yonkers City Sch. Dist. v. CNA Ins. Co.*,
   647 F. Supp. 1495 (S.D.N.Y. 1986)................................................................19

*Dowding v. Nationwide Mut. Ins. Co.*,
   No. 20 C 4118, 2020 WL 5800728 (N.D. Ill., Sept. 29, 2020).........................................15

*FirstMerit Bank, N.A. v. Ferrari*,
   71 F. Supp. 3d 751 (N.D. Ill. 2014) ................................................................24

*Graspa Consulting, Inc. v. United Nat'l Ins. Co.*,
   No. 20-23245, 2020 WL 7062449 (S.D. Fla. Nov. 17, 2020) ..........................................11

*Gregory Packaging Co. v. Travelers Property Casualty Co. of America*,
   No. 2:12–cv–04418, 2014 WL 6675493 (D.N.J. Nov. 25, 2014).....................................11

*Hanover Ins. Co. v. Weirfield Coal, Inc.*,
   No. 1:19-CV-04456, 2020 WL 4261195 (E.D.N.Y., July 24, 2020)................................20

*Hernor Co. v. Superior Fire Ins. Co.*,
   39 F.2d 477 (E.D.N.Y. 1930)............................................................................................19

*Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*,
   379 F. Supp. 3d 687 (N.D. Ill. 2019) ................................................................................3

*Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's London*,
   No. 8:20-cv-1605-T-30AEP, 2020 WL 5791583 (M.D. Fla. Sept. 28, 2020) .................16

*Malaube, LLC v. Greenwich Insurance Company*,
   No. 20-22615, 2020 WL 5051581 (S.D. Fla. Aug. 26, 2020) ..........................................16

*Mama Jo's, Inc. v. Sparta Ins. Co.*,
   No. 17-cv-23362-KMM, 2018 WL 3412974 (S.D. Fla., June 11, 2018) .........................16

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
   No. 20-CV-03213-JST, 2020 WL 5525171 (N.D. Cal. Sept. 14, 2020)...........................11

*Newman Myers Kreines Gross Harris, P.C. v. Great Northern Insurance Co.*,
   17 F. Supp. 3d 323 (S.D.N.Y. 2014).................................................................................13

*One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*,
   No. 11 C 2520, 2015 WL 2226202 (N.D. Ill. Apr. 22, 2015)...........................................17

*Promotional Headwear Int'l v. Cincinnati Ins. Co.*,
   No. 20-cv-2211-JAR-GEB, 2020 WL 7078735 (D. Kan. Dec. 3, 2020)..........................10

*Real Hospitality, LLC v. Travelers Casualty Ins. Co. of Am.*,
   No. 2:20-cv-00087-KS-MTP, 2020 WL 6503405 (S.D. Miss. Nov. 4, 2020) .................11

*Seifert v. IMT Ins. Co.*,
   No. CV 20-1102 (JRT/DTS), 2020 WL 6120002 (D. Minn. Oct. 16, 2020)....................11

*Stack Metallurgical Services Inc. v. Travelers Ins. Co. of Connecticut*,
   No. 05-1315-JE, 2007 WL 464715 (D. Or. 2007).............................................................12

*Studio 417, Inc. v. Cincinnati Ins. Co.*,
    No. 20-CV-03127-SRB, 2020 WL 4692385 (W.D. Mo. Aug. 12, 2020)........................10

*Travco Ins. Co. v. Ward*,
    715 F. Supp. 2d 699 (E.D. Va. 2010) ..............................................................................11

*Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    No. 20-11655, 2020 WL 5258484 (E.D. Mich. Sept. 3, 2020)........................................11

*U.S. Underwriters Ins. Co. v. Affordable Housing Found., Inc.*,
    256 F. Supp. 2d 176 (S.D.N.Y. 2003)...........................................................................19

*Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.*,
    No. 20-cv-03750-WHO, 2020 WL 6562332 (N.D. Cal. Nov. 9, 2020) ...........................11

*West Coast Hotel Mgmt. v. Berkshire Hathaway Guard Ins. Co.*,
    No. 2:20-cv-05663-VAP-DFM, 2020 WL 6440037 (C.D. Cal. Oct. 27, 2020) ...............11

*Yale Univ. v. Cigna Ins. Co.*,
    224 F. Supp. 2d 402 (D. Conn. 2002)............................................................................12

**State Court:**

*Allstate Ins. Co. v. Stone*,
    863 P.2d 1085 (N.M. 1993) ...........................................................................................19

*Assurance Co. of Am. v. BBB Serv. Co.*,
    265 Ga. App. 35, 593 S.E.2d 7 (2003)...........................................................................23

*Bailey v. Fish & Neave*,
    868 N.E.2d 956 (N.Y. 2007)...................................................................................8, 9, 14

*Belt Painting Corp. v. TIG Ins. Co.*,
    100 N.Y.2d 377 (2003) ................................................................................................9, 16

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*,
    10 N.Y.3d 187, 886 N.E.2d 127 (2008)...........................................................................4

*Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*,
    28 N.Y.3d 675 (2017) .....................................................................................................18

*Liberty Mut. Ins. Co. v. Fairbanks Co.*,
    170 F. Supp. 3d 634 (S.D.N.Y. 2016)..............................................................................8

*Matzner v. Seaco Insurance Co.*,
    No. CIV. A. 96-0498-B, 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998) ...............13

*MDW Enters., Inc v. CNA Ins. Co.*,
    4 A.D.3d 338 (2d Dep't 2004) ........................................................................... 7, 8, 17

*Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*,
    24 A.D.3d 743 (2nd Dept.) ....................................................................................... 13

*Pioneer Tower Owners Ass'n v. State Farm Ins. Co.*,
    908 N.E.2d 875 (N.Y. 2009) .................................................................................... 19

*Pittsburg & S.R. Co. v. Central Trust Co. of N.Y.*,
    156 A.D. 182 (1st Dep't 1913) ................................................................................. 20

*Platek v. Town of Hamburg*,
    26 N.E.3d 1167 (N.Y. 2015) .................................................................................. 7, 8, 9

*Purrelli v. State Farm Fire & Casualty Co.*,
    698 So.2d 618 (Fla. 2d DCA 1997) .......................................................................... 18

*Roundabout Theatre Co. v. Cont'l Cas. Co.*,
    302 A.D.2d 1 (1st Dep't 2002) ................................................................................. 14

*RSUI Indemnity Co. v. The Lynd Co.*,
    466 S.W.3d 113 (Tex. 2015) ..................................................................................... 22

*Schlamm Stone & Dolan v. Seneca Ins. Co.*,
    No. 603009/2002, 2005 WL 600021 (N.Y. Sup. Ct. Mar. 4, 2005) ......................... 12

*Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*,
    34 N.Y.2d 356 (N.Y. 1974) ...................................................................................... 18

*Tire Kingdom, Inc. v. First S. Ins. Co.*,
    573 So. 2d 885 (Fla. DCA 3d 1990) ......................................................................... 19

*Widder v. La. Citizens Prop. Ins. Corp.*,
    82 So.2d 294 (Ct. App. La. 2011) ............................................................................ 12

**Miscellaneous Authority:**

2 Couch on Insurance § 22:42 (3d ed. 2020) ................................................................ 22

16 Williston on Contracts § 49:15 .................................................................................. 19

David A. Borghesi, *Business Interruption Insurance – A Business Perspective*,
    17 Nova L. Rev. (1993) ............................................................................................... 4

Jenifer Leman, *Severe wildfires spark population boom in fungi and bacteria*, NATURE
    (Jan. 16, 2019), available at https://www.nature.com/articles/d41586-019-00151-8........18

University of Bergensis, Centre for Geobiology, *What Are Microorganisms?*
    (2010), https://www.uib.no/en/geobio/56846/what-are-microorganisms..........................18

*Webster's Unabridged Dictionary* (2001 ed.) ........................................................................9, 10

## INTRODUCTION

Plaintiff America's Kids, LLC, which operates a small chain of children's-wear department stores, purchased from Defendant Zurich Insurance Company a $12,750,000 all-risk insurance policy with specific business interruption coverages. These coverages are designed to insure lost income at America's Kids' stores when a fortuitous event, such as a global pandemic, forces them to suspend their operations. In March of this year, that very thing happened. However, when America's Kids filed a claim for its losses, Zurich swiftly rejected it. Conforming to the insurance industry's across-the-board denial of such claims, Zurich determined that there was no coverage under its policy for any coronavirus-related losses.

Zurich's arguments for dismissal in this case echo those of the industry writ large, but they do not track the language of Zurich's own policy. In Zurich's telling, this case is comparable to a mélange of others involving policies with standard-form virus exclusions not contained in Zurich's policy. But even a cursory review of the policy and the complaint's specific allegations show that this case is different. The policy in this case, unlike those relied upon by Zurich, specifically refers to "microorganisms," including viruses, as a cause of "direct physical loss of or damage to property." There is simply no authority under New York law which supports Zurich's construction of coverage in contradiction of the policy's own provisions. To that end, while Zurich attempts to simplify the case by invoking a "microorganism" exclusion found on a separate coverage form, its briefing entirely ignores at least two other policy provisions that provide coverage specifically for microorganisms—one of which, unlike the exclusion, is plainly encompassed in the policy's business interruption coverage. These specific grants of microorganism coverage pose a serious problem for Zurich's position that the "microorganism" exclusion "unambiguously excludes coverage for the precise situation pleaded

1

here." To the contrary, applying that exclusion to this case as Zurich would have it negates certain other coverages, renders entire coverage provisions mere surplusage, and upends the parties' reasonable expectations. The resulting ambiguity must be resolved, at least at this stage, in favor of coverage. Thus, the motion to dismiss should be denied.

## BACKGROUND

### I.      The pandemic.

The coronavirus pandemic needs little introduction. SARS-CoV-2 is a highly contagious virus that has spread rapidly across the globe, including (and especially) in the United States. (FAC ¶ 36.) The virus is a physical substance spread through the air and on surfaces, physically transforming the air and rendering infected spaces dangerous and unsafe. (*Id.* ¶¶ 37-38.) According to the New England Journal of Medicine, SARS-CoV-2 can survive on surfaces for up to 3 days. (*Id.* ¶ 39.) Another study found that it could survive on surfaces, thus rendering them dangerous, for up to nine days. (*Id.* ¶ 40.)

SARS-CoV-2 appears to have reached U.S. shores early in 2020. (*See Id.* ¶ 62.) Plaintiff's retail locations—which are predominately in heavily populated, urban areas and rely on in-person shopping, face-to-face interaction, and frequent contact with surfaces—became particularly dangerous environments for occupants. Indeed, individuals carrying the virus entered all of Plaintiff's stores in the beginning of March. (*Id.* ¶¶ 88-89.) This exposed all of Plaintiff's premises to the virus, making them unsafe environments for shopping, untenantable for Plaintiff's business, and unfit for their intended purpose. Plaintiff initially attempted to continue operations while taking precautions to minimize the effect of the virus, but it quickly became apparent that it was impracticable to safely continue operations. (*Id.* ¶¶ 84, 85, 91.)

2

Given the rapid spread of the potentially deadly disease caused by the virus, COVID-19, many local governments endeavored to arrest the spread of the disease by limiting or prohibiting certain activities. (*See id.* ¶ 44.) Authorities in the states and localities in which Plaintiff's stores are located determined that the heightened safety threat posed by the virus in certain indoor places required the imposition of closure and stay-at-home orders. (*Id.* ¶¶ 53, 58-59, 64-65, 70-72, 78-79.) These orders generally required "non-essential" business, like Plaintiff's, to cease operations. (*Id.* ¶ 87.) The damage caused by the virus and the closure orders caused Plaintiff to suffer significant losses. (*Id.* ¶ 92.) It applied to Zurich for coverage of these losses, but Zurich denied coverage without even conducting an investigation. (*Id.* ¶¶ 92, 93.)

## II. Plaintiff's insurance contract.

Plaintiff America's Kids, LLC, is a family-owned business that operates 18 children's-wear department stores in the mid-Atlantic and Illinois. (*Id.* ¶ 1.) In exchange for a substantial premium, Plaintiff purchased insurance coverage for its stores from Defendant Zurich Insurance Company. (*See* Dkt. 32-1, the "Policy," Schedule of Insureds.) The Policy is an "all-risk" policy, "which means that the policy covers all risks or perils except for those that are specifically excluded under the terms of the contract." *Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*, 379 F. Supp. 3d 687, 696 (N.D. Ill. 2019).

The Policy is made up of the Declarations (Policy at 27), General Provisions (*id.* at 64), Commercial Property Conditions (*id.* at 66), Commercial Property Definitions (*id.* at 74), and various coverage forms and endorsements with separate limits negotiated by the insured. The coverage forms by and large contain the following provisions: i) a base grant of coverage, ii) a menu of negotiated "additional coverages" that modify some aspect of the form's base coverage

(and in some instances, circumscribe a narrower limit of insurance), and iii) a list of exclusions. (*See, e.g.*, *id.* at 157 (Table of Contents for Business Income Coverage Form).)

Plaintiff's principal claim for coverage arises under the Business Income Coverage Form, which provides "time element coverage" (*id.* at 92) also known as business interruption coverage. Unlike the traditional location-based coverage of property insurance,[1] which covers only the "loss and the value of the tangible asset," time element coverage recognizes that for commercial enterprises, "another form of economic loss—loss of business income generated by the use of the tangible business property—[is] also at risk" when property is lost or damaged. David A. Borghesi, *Business Interruption Insurance – A Business Perspective*, 17 Nova L. Rev. 1147, 1148 (1993). As one court has explained, "the purpose of [the business interruption policy] was not just to receive money, but to receive it promptly so that in the aftermath of a calamitous event…the business could avoid collapse and get back on its feet as soon as possible." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of New York*, 10 N.Y.3d 187, 194, 886 N.E.2d 127, 131, 132 (2008). The Policy's time element coverage is thus tied to a period of time, or period of business interruption, referred to in this Policy as the "period of restoration."

The base grant of coverage under the Business Income Coverage Form reads as follows:

> We will pay for the actual loss of "business income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at a "premises" … The loss or damage must be directly caused by a "covered cause of loss".[2]

---

[1] The Policy's Real and Personal Property Coverage Form, for example, contains more traditional location-based coverage, covering "direct physical loss of or damage to 'real property' and 'personal property' directly caused by a 'covered cause of loss' at a 'premises'." (Policy at 104.)

[2] Terms that appear in quotations in the insurance contract are defined. Those definitions are provided in this brief when pertinent. A "covered cause of loss" is "a fortuitous cause or event, not otherwise excluded, which actually occurs during this policy period." (*Id.* at 76.)

(Policy at 158) Tacked onto that are several additional business income coverages that essentially modify the time and location elements of the base coverage to account for various circumstances where the business may risk income losses flowing from lost or damaged property. Two are relevant here. First, the additional "civil authority" coverage provides:

> We will pay for the actual loss of "business income" you sustain for up to the number of days shown on the Declarations for Civil Authority resulting from the necessary "suspension", or delay in the start, of your "operations" if the "suspension" or delay is caused by order of civil authority that prohibits access to the "premises" or "reported unscheduled premises". That order must result from a civil authority's response to direct physical loss of or damage to property located within one mile from the "premises" or "reported unscheduled premises" which sustains a "business income" loss. The loss or damage must be directly caused by a "covered cause of loss".

(*Id.* at 158.) Second, the additional "microorganisms" coverage provides:

> We will pay for the actual loss of "business income" you sustain due to the … (a) Necessary "suspension" of your "operations" from direct physical loss of or damage to Covered Property caused by "microorganisms" when the "microorganisms" are the result of a "covered cause of loss;" or (b) prolonged "period of restoration" due to the remediation of "microorganisms" from a covered loss …[3] .

(*Id.* at 159.)[4] "Microorganisms" are defined in the Policy as "any type or form of organism of microscopic or ultramicroscopic size including, but not limited to, 'fungus', wet or dry rot, *virus*, algae, or bacteria, or any by-product." (*Id.* at 81) (emphasis added). Finally, the form's

---

[3]     Applying well-established principles of contract interpretation, this additional coverage is best understood as an extension of the base coverage when "microorganisms" are a cause of loss. While the base language requires "loss of or damage to the 'premises,'" this extension applies to "loss of or damage to Covered Property." The latter is broader: "Covered Property" refers to "the property that is insured for loss or damage under the applicable Coverage Forms or endorsements" (which includes unreported and unscheduled premises) (*id.* at 64), whereas "premises" refers specifically to "[a] location scheduled on the Declarations..." (*id.* at 86). Likewise, the form's base coverage covers the "period of restoration," which by definition excludes any increased period required to remediate microorganisms (*id.* at 84); the additional coverage extends that time element to a "prolonged 'period of restoration' due to the remediation of 'microorganisms.'"

[4]     An endorsement to the Business Income Coverage Form additionally covers the same losses when caused by loss of or damage to property at a "dependent premise," such as a place where merchandise is manufactured, or a place where it is sold. (*Id.* at 174.)

5

"Exclusions" section includes a list of specific exclusions but does not explicitly reference "microorganisms" as do other coverage forms within the Policy. (*See, e.g.*, *id.* at 117 (Accounts Receivable Coverage Form); *id.* at 135 (Fine Arts Coverage Form); *id.* at 141 (Installation and Service Property Coverage Form); *id.* at 146 (Original Information Property Coverage Form); *id.* at 154 (Transit Coverage Form).) However, that section of the form does provide that "the excluded causes of loss in the Real and Personal Property Coverage Form … apply to loss of 'business income'..." (*id.* at 161).

The Real and Personal Property Coverage Form is thus pertinent to Zurich's motion because its "excluded causes of loss" includes "microorganisms," and by reference, viruses. The exclusion reads, in relevant part:

> We will not pay for loss or damage consisting of, directly or indirectly caused by, contributed to, or aggravated by the presence, growth, proliferation, spread, or any activity of 'microorganisms', unless resulting from fire or lightning. Such loss or damage is excluded regardless of any other cause or event, including a 'mistake', 'malfunction', or weather condition, that contributes concurrently or in any sequence to the loss, even if such other cause or event would otherwise be covered.

(*Id.* at 96.)

Plaintiff also seeks coverage under the Extra Expense Coverage Form, for expenses incurred in dealing with the coronavirus. The Extra Expense Coverage Form provides:

> We will pay for the actual and necessary "extra expense" you incur due to direct physical loss of or damage to property at a "premises" at which a Limit of Insurance is shown for Extra Expense on the Declarations. The loss or damage must be directly caused by a "covered cause of loss".

(*Id.* at 167.) The Extra Expense Coverage Form also includes an additional "civil authority" provision, identical to that of the Business Income Coverage Form, but does not include any additional "microorganisms" coverage. Its "Exclusions" section also generally incorporates all of the exclusions from the Real and Personal Property Coverage Form. (*Id.* at 167-68.)

Finally, the Policy provides several miscellaneous coverages in a unique coverage form aptly titled "Additional Coverages Form." Unlike the additional coverages described above, which are all tied to the underlying base coverage granted in the form, these additional coverages "apply independently of one another." (*Id.* at 108.) The form also provides that "[u]nless otherwise stated, the excluded causes of loss, exclusions, terms, and conditions in the applicable Coverage Forms apply to these Additional Coverages." (*Id.* at 103.) An additional coverage for "microorganisms" in that form reads in relevant part as follows:

> We will pay the following when "microorganisms" are the result of a "covered cause of loss", other than fire or lightning … Direct physical loss of or damage to Covered Property caused by "microorganisms", including the cost of removal of the "microorganisms"; the reasonable cost to tear out and replace any part of the covered building or other property needed to gain access to the "microorganisms"; and the reasonable cost of testing performed after removal, repair, replacement, or restoration of the damaged property is completed, provided there is reason to believe that "microorganisms" are still present.

(*Id.* at 108.)

## ARGUMENT

Plaintiff claims that Zurich's decision to deny coverage constitutes a breach of the insurance contract, and seeks relief for that, as well as a declaratory judgment that the policy requires coverage in these circumstances. (FAC ¶¶ 105-117.)

To determine whether a loss is covered under an insurance policy, the Court "look[s] to the language of the policy." *Platek v. Town of Hamburg*, 26 N.E.3d 1167, 1171 (N.Y. 2015).[5] Insurance contracts, like any contract, are read as a whole, with the Court giving meaning to every provision. *See MDW Enters., Inc v. CNA Ins. Co.*, 4 A.D.3d 338, 341 (2d Dep't 2004).

---

[5]     Zurich argues that New York law applies to this case, but it does not identify any conflicts in the laws of New York and any other jurisdiction that could potentially apply (and Plaintiff's position is that coverage exists either way). Thus a more fulsome choice of law analysis—which may even warrant some discovery— is not necessary at this stage. Plaintiff will assume *arguendo* that New York law applies to this case.

Thus, the Court "construe[s] the policy in a way that affords a fair meaning to *all* of the language employed by the parties in the contract and leaves no provision without force and effect." *Platek,* 26 N.E.3d at 1171 (quotation omitted). Policy terms are generally given their plain and ordinary meaning, but they must also be interpreted in light of the contract as a whole, the language of which reflects the parties' intentions. *See, e.g.*, *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) (Contracts "should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases."); *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 45 (2d Cir. 2006) (interpreting policy term "in the context of the St. Paul Policy"); *Liberty Mut. Ins. Co. v. Fairbanks Co.*, 170 F. Supp. 3d 634, 642 (S.D.N.Y. 2016) (noting that policy terms must be viewed in "the context of the entire integrated agreement" and in view "of the contract as a whole"). "Where the policy is ambiguous, the policy must be narrowly interpreted in favor of the insured." *MDW Enters.*, 4 A.D.3d at 340. The insured, Plaintiff here, bears the burden of establishing coverage, and the insurer bears the burden of establishing that an exclusion to coverage applies. *Platek*, 26 N.E.3d at 1171.

Zurich contends that coverage does not exist because America's Kids did not suffer a "physical loss of or damage to" any property (a prerequisite to all coverage), and, even if it did, because the SARS-CoV-2 virus is involved, coverage is excluded under the "microorganisms" exclusion. Neither contention persuades.[6]

## I. America's Kids has alleged "physical loss of or damage to" covered property.

As Zurich points out, the coverage sought by America's Kids requires "direct physical loss of or damage to" property. Zurich cites several cases supposedly holding that the COVID-19

---

[6] America's Kids' claim also requires other showings, such as that operations were necessarily suspended. There is no dispute at this stage that America's Kids has adequately alleged these other aspects of its claim.

pandemic writ large does not cause any qualifying loss or damage to property. As set forth below, Zurich's legal position—that a virus "doesn't damage the property" as it "does not change a property's structure" (Dkt. 37 at 13-19)—is one that courts have routinely rejected.

### A. The language of the Policy makes clear that America's Kids has suffered a "physical loss of or damage to" its property.

The inquiry into whether America's Kids alleged "direct physical loss of or damage to" its property begins by looking at the policy language. *See Platek*, 26 N.E.3d at 1171. The property coverage forms do not define these terms, but they provide several clues as to its scope which must, if possible, be given "force and effect." (*Id.*) Most pertinently, the Policy makes clear that viruses (i.e., "microorganisms") can cause the "physical loss of or damage" that triggers business interruption coverage. (*See* Policy at 96, 108, 159.) Any construction must therefore acknowledge that viruses can cause the qualifying damage. *See Bailey*, 868 N.E.2d at 959.

Zurich's argument—that Plaintiff cannot allege any facts showing that the coronavirus is covered under the business interruption coverages because it did not cause "structural degradation of the property" (Dkt. 37 at 19)—leaves no room for an interpretation in which a virus causes triggering loss or damage. It therefore violates the rule that every part of an insurance policy must, if such a reading is reasonable, be given "force and effect." *Platek*, 26 N.E.3d at 1171. It is also inconsistent with "common speech." *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003). *Random House Webster's Unabridged Dictionary* defines the noun "damage" as "injury or harm that reduces value or usefulness." *Webster's Unabridged Dictionary*, p. 504 (2001 ed.)[7] In explaining why certain words are synonyms of "damage,"

---

[7]     The Policy specifies that disputes over the meaning of undefined terms are to be resolved by reference to "the most recently published version of Webster's Unabridged Dictionary." (Policy at 64.)

*Webster's* explains that "damage is the kind of injury or the effect of injury that directly impairs appearance, value, usefulness, soundness, etc." *Id.* This reasonably describes what America's Kids alleges. The coronavirus is a physical substance that can attach itself to air and surfaces, where it can live for a period of time.[8] The presence of the virus in a place like an America's Kids store renders the property unfit for its purpose: while the virus is at large, the premises pose a health risk to occupants, are unusable for selling America's Kids' merchandise, and are generally untenantable for commercial purposes. That, *Webster's* tells us, is damage.[9]

Indeed, courts around the country, in construing the phrase "direct physical loss of or damage to" property, but without the benefit of other language making clear that viruses are capable of causing such damage, have reasoned that the alleged presence of SARS-CoV-2 at an insured premise triggers coverage. *See Promotional Headwear Int'l v. Cincinnati Ins. Co.*, No. 20-cv-2211-JAR-GEB, 2020 WL 7078735, at *8 (D. Kan. Dec. 3, 2020) ("A few recent district court cases have determined that an allegation of COVID-19 entering the premises through an employee or customer is sufficient to demonstrate direct physical loss or damage.") (citing, e.g., *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385, at *4–5 (W.D. Mo. Aug. 12, 2020)). Of course, others have concluded that general allegations relating to the COVID-19 pandemic are insufficient to allege the type of loss or damage required by the

---

Given limits imposed by governments in response to the COVID-19 pandemic, the 2001 edition is the latest edition to which counsel reasonably had access.

[8]     *Webster's* defines "physical" as, relevant here, "of or pertaining to that which is material." *Random House Webster's Unabridged Dictionary*, p. 1461 (2001 ed.).

[9]     This reading of "damage" is also consistent with the Policy's liability coverage, which defines "property damage" to mean either "physical injury to tangible property, including all resulting loss of use of that property" or *"loss of use of tangible property that is not physically injured."* (Policy at 217). While the liability coverage appears on separate forms, it is nonetheless part of the Policy and relevant for determining the parties' reasonable expectations.

policy at issue, but these courts frequently note that the plaintiffs before them have failed to allege that SARS-CoV-2 was actually present at their property. *Seifert v. IMT Ins. Co.*, No. CV 20-1102 (JRT/DTS), 2020 WL 6120002, at *3 (D. Minn. Oct. 16, 2020); *West Coast Hotel Mgmt. v. Berkshire Hathaway Guard Ins. Co.*, No. 2:20-cv-05663-VAP-DFM, 2020 WL 6440037, at *4 (C.D. Cal. Oct. 27, 2020); *Turek Enters., Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, at *7 (E.D. Mich. Sept. 3, 2020); *Water Sports Kauai, Inc. v. Fireman's Fund Ins. Co.*, No. 20-cv-03750-WHO, 2020 WL 6562332, at *4 (N.D. Cal. Nov. 9, 2020); *Graspa Consulting, Inc. v. United Nat'l Ins. Co.*, No. 20-23245, 2020 WL 7062449, at *6 (S.D. Fla. Nov. 17, 2020); *Real Hospitality, LLC v. Travelers Casualty Ins. Co. of Am.*, No. 2:20-cv-00087-KS-MTP, 2020 WL 6503405, at *7 n.12 (S.D. Miss. Nov. 4, 2020). One federal judge in California made explicitly clear that the absence of the novel coronavirus from the subject property was critical to his decision, writing that "had Mudpie alleged the presence of COVID-19 in its store, the Court's conclusion about an intervening physical force would be different," and noting that the virus, a physical entity, is similar in type to other substances which have triggered coverage. *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-CV-03213-JST, 2020 WL 5525171, at *5 n.7 (N.D. Cal. Sept. 14, 2020).

In fact, several courts around the country have found that the physical loss or damage underlying business interruption coverage occurs in like circumstances, that is, when commercial premises are made temporarily unsafe or untenantable. *See, e.g.*, *Travco Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 708 (E.D. Va. 2010) (noting that the majority of cases nationwide find that "physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces"). For instance, in *Gregory Packaging Co. v. Travelers Property Casualty Co. of America*, No. 2:12–cv–04418, 2014 WL 6675493 (D.N.J.

11

Nov. 25, 2014), the insured sought coverage for business losses sustained when a leak in a refrigeration system released ammonia into the air at a warehouse belonging to the insured, and the insured determined that the warehouse had to be shut down for several days. (*Id.* at *1.) The court concluded that the insured suffered "direct physical loss to or damage of property" because "the ammonia release physically transformed the air within Gregory Packaging's facility so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated." (*Id.* at *6.) In one case in New York, the court found that "noxious particles" that prevented an insured's employees from safely working clearly caused "property damage" when they "settled in the carpets or other surfaces in plaintiff's offices," and that business loss coverage was thereby triggered. *Schlamm Stone & Dolan v. Seneca Ins. Co.*, No. 603009/2002, 2005 WL 600021, at *4-5 (N.Y. Sup. Ct. Mar. 4, 2005). These cases are not outliers; courts regularly conclude that when a building is beset by some physical substance that renders it unsafe or otherwise untenantable, the insured has suffered the underlying direct physical loss of or damage required for business interruption coverage. *See, e.g.*, *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 412-13 (D. Conn. 2002) (holding that active asbestos and lead contamination caused a covered "direct physical loss of or damage" to property); *Widder v. La. Citizens Prop. Ins. Corp.*, 82 So.2d 294, 296 (Ct. App. La. 2011) (holding that presence of lead constituted a "direct physical loss" and stating that "when a home has been rendered unusable or uninhabitable, physical damage is not necessary"); *Stack Metallurgical Services Inc. v. Travelers Ins. Co. of Connecticut*, No. 05-1315-JE, 2007 WL 464715, at *8 (D. Or. 2007) (policyholder could get coverage after furnace suffered lead contamination, even though furnace was not structurally harmed, because the lead particle contamination "prevented it from being used for its ordinary expected purpose, [and so it] is

12

fairly characterized as a 'direct physical loss of or damage to' the furnace"); *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009) ("Odor can constitute physical injury to property under Massachusetts law, and … allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed."); *Matzner v. Seaco Insurance Co.*, No. CIV. A. 96-0498-B, 1998 WL 566658, at *3-4 (Mass. Super. Ct. Aug. 12, 1998) (carbon monoxide leak in building constituted "direct physical loss or damage"). Much like the coronavirus, the substances at issue in these cases, be it "noxious particles," lead, asbestos, or something else, "damage lungs," they don't cause structural alterations to property. Nevertheless, courts have recognized that the presence of these substances is a type of physical damage covered under a business interruption policy. *See also Parks Real Estate*, 472 F.3d at 49 ("the actual contact of the airborne particulate matter with the Property was the efficient cause of damage to the insured Building").

Zurich pushes back on those decisions, suggesting that New York law generally seems to require more, specifically visible physical damage. Whether or not that is true of New York law as a general matter—Plaintiff disagrees with Zurich's read of things, *see, e.g.*, *Pepsico, Inc. v. Winterthur Int'l Am. Ins. Co.*, 24 A.D.3d 743, 744 (2nd Dept.) (rejecting argument that "demonstrable alteration" was required, holding instead that coverage is triggered when the "function and value [of the property] have been seriously impaired"); *Newman Myers Kreines Gross Harris, P.C. v. Great Northern Insurance Co.*, 17 F. Supp. 3d 323, 330 (S.D.N.Y. 2014) (finding that, under New York law, the term "physical loss or damage" "does not require that the physical loss or damage be tangible, structural or even visible")—it is clear that this Policy specifically contemplates that viruses may cause physical loss or damage. The Policy twice

13

explicitly refers to "direct physical loss of or damage to Covered Property caused by 'microorganisms.'" (Policy at 108). And on six different coverage forms, the Policy explicitly excludes (or purports to exclude) "loss or damage consisting of, directly or indirectly caused by, contributed to, or aggravated by … 'microorganisms.'"[10]

To that end, Zurich's principal authority, *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1 (1st Dep't 2002), is not, as Zurich suggests, a "real problem" for this case. In *Roundabout*, an elevator at a neighboring building collapsed causing a street closure that prevented access to the insured theater and resulted in 35 cancelled shows. (*Id.* at 4.) The plaintiff's policy covered only loss, damage, or destruction to "property and facilities," i.e., the theatre building itself. The court held the plaintiff's alleged "loss of access" to its property based on harm to a *separate property* was not a type of "physical loss [ ] or damage" that triggered coverage. But the business interruption coverage at issue in this case requires physical loss of or damage to the "premises," which by definition "includes the area associated with" the address of the insured business "and includes that area extending 1,000 feet beyond the address." (Policy at 86.) And Plaintiff alleges damage to the "premises." Thus, *Roundabout* is distinguishable.

In sum, the Policy plainly acknowledges that viruses may cause the underlying damage that triggers business interruption coverage.

**B.      Zurich's arguments to the contrary fail.**

Zurich has two rejoinders, but neither is persuasive. First, Zurich insists that any loss in value or usefulness here is caused exclusively by the closure orders, which do not "physically

---

[10]      These mentions omit the qualifier "direct physical," but as they are contained within purported exclusions to coverage triggered by a "direct physical loss of or damage to property," they are reasonably read as referring only to that type of loss or damage. *See Bailey*, 868 N.E.2d at 959 (noting that contracts "should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases").

alter the integrity of the property." (Dkt. 37 at 15-17.) But that argument is contradicted by the allegations in the complaint, which must be presumed true at this stage. *See Dowding v. Nationwide Mut. Ins. Co.*, No. 20 C 4118, 2020 WL 5800728 (N.D. Ill., Sept. 29, 2020). America's Kids alleges that it was impossible to continue operations in a way that was not hazardous to employees and customers because of the virus itself. (FAC ¶ 85-86.) Zurich suggests that these allegations can be ignored because they are internally inconsistent (Dkt. 37 at 21 n.8), but that contention is mistaken. That government authorities arrived at the same conclusion about the damage caused by the virus does not change the nature of that damage, as a matter of law, into something created by a government order. Indeed, it would lead to absurd results to hold that each time the government acts in a way consistent with the insured's duty to mitigate risk, that action would force the insured's losses outside the ambit of coverage.

Zurich also contends that if any microorganisms can simply be cleaned, they cannot, as a matter of law, cause any loss or damage to the property. (Dkt. 37 at 18-19.) That limitation certainly doesn't appear in the Policy, and again, it would be inconsistent with the Policy's acknowledgement that viruses can cause physical loss or damage. Indeed, Plaintiff is unaware of any cleaning solution which would allow it to maintain normal business operations without exposing its patrons and employees to a severe health threat.

Unsurprisingly, Zurich's cases stand for a narrower proposition than it advances. Zurich's principal case for this point is *Universal Image Productions, Inc. v. Federal Insurance Co.*, 475 F. App'x 569 (6th Cir. 2012). In that case the insured moved its work space because mold issues in the HVAC system made the temperature inside the building unpleasantly hot, but the court, applying Michigan law, deemed there to be no "physical loss or damage" from the mold because "no health threat existed" and "Universal has not put forth any evidence indicating that such

temporary conditions rendered the building 'uninhabitable' or substantially 'unusable.'" (*Id.* at 574-75.) But Plaintiff alleges precisely that here. (FAC ¶ 86.) The health threat that patrons would be exposed to the coronavirus at Plaintiff's business could not be remediated by merely cleaning the business's surfaces. Zurich's citation to *Mama Jo's, Inc. v. Sparta Ins. Co*., No. 17-cv-23362-KMM, 2018 WL 3412974, at *8 (S.D. Fla., June 11, 2018) is equally misplaced. In *Mama Jo's*, the insured attempted to recover for construction dust entering its restaurant, but "the restaurant remained open every day, customers were always able to access the restaurant, and there is no evidence that dust had an impact on the operation other than requiring daily cleaning." (*Id.* at *9*.) Further, Zurich's citations to two recent decisions in Florida are inapposite because in neither case did the insured allege that the coronavirus was actually on its property. *See Infinity Exhibits, Inc. v. Certain Underwriters at Lloyd's London*, No. 8:20-cv-1605-T-30AEP, 2020 WL 5791583, at *4 (M.D. Fla. Sept. 28, 2020); *Malaube, LLC v. Greenwich Insurance Company*, No. 20-22615, 2020 WL 5051581, at *8 (S.D. Fla. Aug. 26, 2020).

Therefore, America's Kids has adequately alleged that it suffered the underlying "physical loss of or damage to" property required to trigger its business interruption coverage.

## II. The microorganisms exclusion does not preclude coverage.

Zurich next rests its defense on a "microorganism" exclusion set forth in the Real and Personal Property Coverage Form, which it purports to apply broadly to the business interruption coverage forms. Under New York law, Zurich bears the "heavy burden" of proving that Plaintiff's claims fall entirely and unambiguously within any exclusion. *Belt Painting*, 100 N.Y.2d at 383. As shown below, Zurich fails to carry its burden.

The rules safeguarding the reasonable expectations of the insured are especially rigorous in the context of exclusions. "When an insurer wishes to exclude certain coverage from its policy

16

obligations, it must do so in clear and unmistakable language." *MDW Enterprises, Inc.*, 4 A.D.3d 338, 340–41 (2d Dep't 2004) (citations omitted).

In a vacuum, the microorganisms exclusion is less problematic. The Real and Personal Property Coverage Form contains a broad, general grant of coverage for "direct physical loss of or damage" to certain property, then broadly excludes any "loss or damage consisting of, directly or indirectly caused by, contributed to, or aggravated by the presence, growth, proliferation, spread, or any activity of 'microorganisms….regardless of any other cause or event…that contributes concurrently or in any sequence to the loss, even if such other cause or event would otherwise be covered.'" (Policy at 97.) This final clause is known as an "anti-concurrent cause clause," that is, language that "is meant to exclude coverage for damage caused by an excluded peril even when covered perils also contribute to the damage." *One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 11 C 2520, 2015 WL 2226202, at *17 (N.D. Ill. Apr. 22, 2015). In other words, with this exclusion in play, no event in a causal chain that results in microorganisms can be a covered cause of loss under the Policy.

The problem for Zurich is that this Policy contains additional "microorganism" coverages intentionally added to the Policy to expand coverage for the same grounds that the exclusion purports to take away: "direct physical loss of or damage to Covered Property caused by 'microorganisms'." (Policy at 108, 159.) Indeed, America's Kids specifically negotiated additional coverage under both the Business Income Coverage Form and the Additional Coverages Form for when "'microorganisms' are the result of a 'covered cause of loss'." (*Id.* at 108.) But if the exclusion's anti-concurrent cause language is to be taken seriously, as Zurich

17

contends, then microorganisms can never be the "result of" a "covered cause of loss," because the exclusion excludes any other event in a causal chain involving microorganisms. [11]

In other words, under Zurich's construction of the Policy, a specific grant of coverage is nullified by an exclusion. But exclusions must be read narrowly to harmonize with the Policy provisions as a whole. *See Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356 at 361 (N.Y. 1974) (rejecting an insurer's interpretation of an exclusion because the interpretation would render the coverage nearly illusory); *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684–85 (2017) (citing *Lipton* and explaining under New York law insurance policies cannot be interpreted such that coverage is rendered illusory). The contradiction at best creates an ambiguity. Indeed, one Florida court has called this the "grossest form of ambiguity." *Zucker for BankUnited Fin. Corp. v. U.S. Specialty Ins. Co.*, 856 F.3d 1343, 1352 (11th Cir. 2017) (quoting *Purrelli v. State Farm Fire & Casualty Co.*, 698 So.2d 618, 620 (Fla. 2d DCA 1997)). It is one thing for a broad grant of coverage to be accompanied by a specific exclusion. It is another for a specific grant of "additional coverage," specifically contracted for by the insured, to be completely wiped out by an exclusion. As one federal district judge in New York has explained, "courts must … avoid construing conflicting provisions and ambiguities within a policy in such a manner as to negate certain coverages, or in ways that render coverage

---

[11]     The exclusion appears to account for this by excepting "microorganisms" "resulting from fire or lightening" from the excluded causes of loss. (Policy at 97.) It is not unusual for fires to result in increased microorganism populations, as they are generally understood to improve environments for microbial growth and activity. Jenifer Leman, *Severe wildfires spark population boom in fungi and bacteria*, NATURE (Jan. 16, 2019), available at https://www.nature.com/articles/d41586-019-00151-8. But the weight of scientific authority concludes that viruses do not embody the traits of living organisms because they do not respond to changes in the environment and cannot reproduce on their own (i.e., they only replicate by infecting a host cell). *See, e.g.*, University of Bergensis, Centre for Geobiology, *What Are Microorganisms?* (2010), https://www.uib.no/en/geobio/56846/what-are-microorganisms. The scientific relationship between fire and microorganisms thus does not translate to viruses: a virus cannot reasonably be expected to occur as a result of either fire or lightning. Consequently, when a virus is the cause of loss, the fire and lightening exceptions become illusory.

provisions mere surplusage." *U.S. Underwriters Ins. Co. v. Affordable Housing Found., Inc.*, 256 F. Supp. 2d 176, 181 (S.D.N.Y. 2003); *see Bd. of Educ., Yonkers City Sch. Dist. v. CNA Ins. Co.*, 647 F. Supp. 1495, 1504 (S.D.N.Y. 1986) ("Where an insurance contract contains conflicting clauses, that which affords greater or more inclusive coverage will govern."); *Hernor Co. v. Superior Fire Ins. Co.*, 39 F.2d 477, 478 (E.D.N.Y. 1930) ("It is the law that, in the event of inconsistent or repugnant clauses, the policy must be construed in favor of the insured."). Given that New York law regarding exclusions is "highly favorable to insureds," *Pioneer Tower Owners Ass'n v. State Farm Ins. Co.*, 908 N.E.2d 875, 886 (N.Y. 2009), the better construction of the Policy is one in which the microorganisms exclusion does not negate coverage here.

It makes little sense to conclude that the parties negotiated two specific coverage provisions that were dead on arrival. The better read, in the case of these "repugnant" clauses, is that the microorganisms exclusion does not apply to coverage forms that expressly provide microorganism coverage, and the attempt to incorporate the microorganisms exclusion into those coverage forms is ineffective, as an insured would reasonably not expect that exclusion to apply. Courts have generally erred in favor of coverage whenever they encounter "repugnant" clauses in an insurance contract. *See In re Popkin & Stern*, 340 F.3d 709, 716 (8th Cir. 2003); *Tire Kingdom, Inc. v. First S. Ins. Co.*, 573 So. 2d 885, 887 (Fla. DCA 3d 1990) ("The policy in this case attempts to provide coverage for certain advertising activities and then exclude those same activities. Such inconsistencies must be resolved in favor of the insured, as liability limiting exclusions are interpreted strictly against the insurer and liberally in favor of the insured."). The purpose of the rule construing against the drafter is to incentivize insurers to "use clear, explicit, and precise language." 16 Williston on Contracts § 49:15. As the Supreme Court of New Mexico has explained, in circumstances like these, it is not exactly correct to say that the Court's task is

19

to construe ambiguity in favor of the insured. *See Allstate Ins. Co. v. Stone*, 863 P.2d 1085, 1088 (N.M. 1993) ("we are not so much construing an ambiguity in the policy in favor of the insured as we are refusing to give effect to the irreconcilable exclusionary language in the policy"). In light of the rule that exclusions are strictly construed against the insurer, "when an exclusionary clause simply nullifies a grant of coverage," it is disregarded. (*Id.*) (citation omitted).[12]

At the very least, the microorganisms exclusion should not be applied here for the additional reason that it is drafted in such a way that would suggest it is not applicable to time element coverage. The Real and Personal Property Coverage Form, in which the exclusion appears, provides traditional location-based coverage, as described above, and the language of the exclusion adopts the location-based character of the coverage in that form. In other words, the "loss or damage" referred to in the language of the exclusion can reasonably be understood to refer to the underlying loss or damage at a premises, and not the income losses that flow from it. If Zurich intended this exclusion to adopt the time element character of the business interruption coverages, it bore the burden of saying so clearly and explicitly. *See Hanover Ins. Co. v. Weirfield Coal, Inc.*, No. 1:19-CV-04456, 2020 WL 4261195, at *3 n.7 (E.D.N.Y., July 24, 2020). But it did not, instead incorporating the exclusion only by a loose reference to an unrelated coverage form. Indeed, the explicit reference to a "microorganisms" exclusion in the

---

[12] Some older cases suggest that where two clauses are repugnant, the first controls. *Pittsburg & S.R. Co. v. Central Trust Co. of N.Y.*, 156 A.D. 182, 189 (1st Dep't 1913). But that rule was frequently intended to prevent exclusions (which are listed second) from swallowing coverage grants (which are listed first). (*See id.*) In other words, this is just another way of saying that insurance policies are construed in favor of coverage. Moreover, application of that rule would make little sense here, given that the Policy is contained in a series of coverage forms, rather than a single document, as in *Pittsburg*, and these later forms evidently modify earlier language. *See, e.g.*, *Harper v. Hochstim*, 278 F. 102, 105 (2d Cir. 1921) (rejecting rule requiring resolution of inconsistencies by order of drafting, saying that "every rule should be one of reason" and applied in light of "circumstances surrounding and justifying their formulation"). Other older cases discuss resolving repugnancies to "make effectual the evident purpose of the entire instrument." (*See id.*) As explained above, the purpose of business interruption insurance in particular is to insure against losses from unexpected events which prevent the insured from operating their business. That purpose is advanced by construing the Policy in favor of coverage here.

Real and Personal Property Coverage Form but not the business interruption coverage forms seems to suggest that the exclusion was meant to *retain* its location-based character.[13]

Zurich's brief ignores these issues entirely, perhaps understandably, because to acknowledge them would force Zurich to concede that it was accepting premiums for, in part, coverage that it believes did not exist. Of course, the issue is entirely of Zurich's making. As the Complaint explains, the Insurance Services Office, a sort of industry clearing house for form policy language, drafted a standard-form endorsement excluding coverage for losses caused by the presence of disease-causing agents. (FAC ¶ 14.) Zurich elected not to incorporate that language into the policy, instead relying on a loosely arranged "microorganisms" exclusion that causes more problems than it solves. It was of course Zurich's prerogative to take liberties with standard coverage forms—mixing, matching, and tweaking the language to its liking—but it appears to have done so inattentively here. As the drafter, Zurich bears the consequences of that choice. *See Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 69, 697-98 (2d. Cir. 1998).

In sum, the Court should reject Zurich's argument that the "microorganisms" exclusion precludes coverage here.

---

[13]     Nor does it make sense to conceive of the microorganism coverages in the Additional Coverages Form and the Business Income Form as narrow exceptions to the microorganisms exclusion. Most importantly, that's not how the provisions are drafted. No reasonable policyholder would understand a provision under the header of "additional coverages" to instead constitute an exception to an exclusion. And in any event, it isn't clear what scope of coverage these provisions would carve out as "exceptions." The provisions in both the Additional Coverages form and the Business Income form refer to damage "caused" by microorganisms. The exclusion refers to damage "consisting of, directly or indirectly caused by, contributed to, or aggravated by" microorganisms. Despite the verbosity of the exclusion, there is a one-to-one match here. But the nature of an "exception" is that it applies to less than the whole set. From the perspective of a reasonable insured, there is no difference between the types of damage referenced by these provisions, so there is no "exception" present.

**III.     The Closure Orders were the result of a response to property damage.**

Zurich next targets Plaintiff's claim for coverage under the Policy's civil authority coverage provisions, which allow for recovery in the event an order of a civil authority prevents access to the Plaintiff's property. According to Zurich, this claim for coverage fails because the relevant orders were issued in response to the coronavirus pandemic and not in response to "physical loss of or damage to property."

As explained above, this is largely a distinction without a difference. The virus itself, by rendering properties unsafe and unfit for use, caused property damage within the meaning of the Policy. The language of the civil authority provision—"response to direct physical loss of or damage to property" (Policy at 158) tracks precisely the language found in the base business interruption coverage as well as in the other additional coverages discussed above. An insured would reasonably expect that the same concept was intended to be incorporated into the civil authority provision, regardless of the language of the order of the civil authority. *See, e.g.*, 2 Couch on Insurance § 22:42 (3d ed. 2020) ("An expression to which a plain meaning is attached in one part of an instrument is held to have the same meaning in other parts of the same instrument unless a contrary purpose plainly appears."); *see also RSUI Indemnity Co. v. The Lynd Co.*, 466 S.W.3d 113, 126 (Tex. 2015) (noting the "natural presumption" that "identical language" that appears in different parts of a single document is "intended to have the same meaning"); *Willingham v. Life & Cas. Ins. Co.*, 216 F.2d 226, 227 (5th Cir. 1954) ("Ordinarily the same words used in different clauses of a contract will be understood to have been used in the same sense.").

Zurich ascribes essentially talismanic significance to the fact that the closure orders in the specific jurisdictions in which there are America's Kids stores did not specifically mention

property damage. Indeed, many authorities recognized that the virus threatened property. (*See* FAC ¶ 44.) But nothing in the Policy suggests that the language of a closure order determines its relevance to coverage under the civil authority provisions. Moreover, there is no reason to cede coverage decisions to a decisionmaker who is not even aware of policy language. Thus, because the closure orders responded to the exact same conditions that caused "direct physical loss of or damage to" Plaintiff's property within the meaning of the Policy, they trigger civil authority coverage here.

Zurich suggests that the orders were exclusively preventative in nature. (Dkt. 37 at 20.) But that's not true. The communities surrounding the America's Kids stores had experienced significant community spread of the virus before the relevant orders were issued. Indeed, the closure orders were all plainly meant to stop *further* damage from occurring. (*See, e.g.*, Dkt. 39-3 at 1 (acknowledging that community spread already has occurred); Dkt. 39-7 at 2 (acknowledging the extant presence of the novel coronavirus in New Jersey and surrounding states).) And courts have held that government orders to evacuate properties can trigger coverage under similar civil authority provisions, even when the insured property itself does not ultimately suffer any tangible, physical damage. *See, e.g.*, *Assurance Co. of Am. v. BBB Serv. Co.*, 265 Ga. App. 35, 36, 593 S.E.2d 7, 9 (2003) (holding restaurants could recover business interruption coverage when ordered to evacuate to prevent further damage, even though the hurricane did not ultimately cause tangible damage to the restaurant). In other words, although there was a preventative aspect to the closure orders, they all followed in the wake of existing damage.

Zurich also says that Plaintiff's claim fails because it fails to allege specifically where the damage occurred. Relying on a decision from the Central District of California, Zurich essentially contends that Plaintiff must describe in detail the property that was damaged and

23

connect that description to the order. But that decision does not set such a high bar for pleading

such claims. *See 10E, LLC v. Travelers Indem. Co of Conn.*, No. 2:20-cv-04418-SVW-AS, 2020

WL 5359653, at *6 (C.D. Cal. Sept. 2, 2020). In *10E*, the court found that "conclusory"

allegations that "the property that is damaged is in the immediate area of the Insured Property"

merely paraphrased the policy, and so was not entitled to a presumption of truth on a motion to

dismiss. (*See id.*) Zurich contends the same is true here, but that is hard to take seriously.

For one, the "connection" Zurich demands between the property loss or damage and the

closure order need not be direct. The Policy does not require that the order of the civil authority

be in direct response to property damage, but only that it "result from" the civil authority's

"response" to property damage. (Policy at 158.) These terms plainly cannot be meant to denote

direct or exclusive cause, as the very same paragraph specifies that the relevant property damage

"must be directly caused" by a covered cause of loss. (*Id.*)

Second, Zurich asks the Court to disregard Plaintiff's allegations, made on information

and belief, that properties in the vicinity of Plaintiff's premises were harmed by the novel

coronavirus. (Dkt. 37 at 21.) But "under Rule 8(a), a party alleging matters peculiarly within

another party's knowledge may plead those matters on 'information and belief.'" *FirstMerit*

*Bank, N.A. v. Ferrari*, 71 F. Supp. 3d 751, 757 (N.D. Ill. 2014) (citing *Brown v. Budz*, 398 F.3d

904, 914 (7th Cir. 2005)). To the extent *10E* counsels in favor of ignoring these "information and

belief" allegations, it is inconsistent with binding Seventh Circuit case law, not to mention Rule

8 itself. Given the significant community spread of SARS-CoV-2 by early March, America's

Kids may plausibly allege that the virus damaged property in the vicinity of its stores. That

allegation is hardly speculative, particularly in New York City, which suffered the first

widespread outbreak of the virus (*see* FAC ¶ 51), and Chicago, where the virus first appeared

several months before the first closure order (*see id.* ¶ 62). Stores within the vicinity of Plaintiff's stores would have been harmed by the virus by the fortuity of being accessed by those carrying the virus, further spreading it. (*See id.* ¶¶ 38-40 (discussing the spread of the coronavirus).) This damage, along with the threat to human health that it posed, precipitated the various closure orders. In that way, the orders were in part a "response" to the relevant property damage. And by requiring that Plaintiff's stores remained closed, the orders "prohibit[ed] access" by Plaintiff's customers to the covered premises, as required to trigger coverage under the civil authority coverage provisions. (Policy at 158, 167)

## IV.  Plaintiff has stated a claim for Dependent Premises coverage.

Zurich's brief argument about Dependent Premises coverage warrants little discussion. For instance, Zurich contends that Plaintiff has failed to show coverage under the Dependent Premises Endorsement because school events are not the type of premise to which the coverage attaches. (Dkt. 37 at 21.) But of course the events were cancelled because schools (the relevant dependent premise, both a "recipient location" and a "leader location" under the Policy) were closed. (*See* FAC ¶ 91.) Zurich again faults America's Kids for failing to identify specifically the schools that were closed, or the damage they suffered, but for the reasons just discussed, Plaintiff's general allegations are plainly plausible at this stage, and can be supplemented during discovery.

## CONCLUSION

The Court should deny the motion to dismiss the breach of contract claim. And because a live dispute remains, the Court should also deny the motion to dismiss the declaratory judgment claim.

Respectfully submitted,

**AMERICA'S KIDS, LLC**, individually and on behalf of all others similarly situated,

Date: December 11, 2020

/s/    Lily Hough
*One of Plaintiff's Attorneys*

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Lily Hough
lhough@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435